CARL JORGENSEN, PLAINTIFF-RESPONDENT, v. THE PENNSYLVANIA RAILROAD COMPANY, A CORPORATION, DEFENDANT-APPELLANT, AND JOHN E. ULICH, DEFENDANT.

Argued November 12, 18, 1957—Decided January 20, 1958.

*Mr. Stanley W. Greenfield* argued the cause for respondent.

*Mr. Stephen VR. Strong* argued the cause for appellant (*Messrs. Strong & Strong,* attorneys).

The opinion of the court was delivered by

PROCTOR, J. The defendant appeals from a judgment awarding the plaintiff, a former employee, substantial damages for wrongful discharge, defamation and false imprisonment. This is the second judgment recovered by

the plaintiff. The first, which was entered upon jury verdicts for $80,000 and reduced by the trial court to $60,000, was reversed by the Appellate Division in *Jorgensen v. Pennsylvania Railroad Co.*, 38 *N. J. Super.* 317 (1955), and remanded for a new trial. Upon remand the plaintiff recovered the present judgment entered upon jury verdicts for $104,000, which was reduced by the trial court to $85,000. The defendant has impugned all the verdicts recovered on various grounds. Because of the importance of the basic issue as to whether an employee may recover damages for an alleged wrongful discharge in a court of law in a case of this kind, we certified the cause on our own motion prior to consideration by the Appellate Division.

Plaintiff is a dining car steward who had been employed by the defendant for seven and one-half years prior to June 16, 1953. As steward he was in charge of the dining car, the food and equipment, and supervised the crew assigned to it and the cooks, waiters and additional help.

On June 16, 1953 the train to which the plaintiff's dining car was attached arrived in the Pennsylvania Railroad Station in New York City at 9:30 A. M. Upon its arrival the defendant's Supervisor of Service, John E. Ulich, and two railroad police officers, Anthony E. Canino and Leslie B. Olcott, entered the dining car, and Ulich announced that a spot bag inspection was to be made of the members of the crew. At this point there was widely divergent testimony at the trial below as to what actually occurred.

Jorgensen testified that he had previously taken a small piece of ham from the kitchen refrigerator in order to make a sandwich for himself, but since he found no time to do so had placed it in a small bar refrigerator in the car. As he was preparing to leave the car he remembered the piece of ham that he had left in the bar refrigerator, and with the intention of returning it to the larger kitchen refrigerator he picked it up in a napkin and started to walk toward the kitchen refrigerator with the ham in one hand and his personal bag in the other, when Ulich and the two railroad police officers entered and announced the bag inspection.

Jorgensen's version of this part of the incident was substantially corroborated by three members of the dining car crew.

Jorgensen further testified that upon the announcement of the inspection he stopped and placed his bag on a table and placed the ham next to it. He stated that Ulich then walked over toward him, picked the ham up from the table and told one of the other officers: "Hold that man," and after a brief conference with the other officers Ulich told Jorgensen to follow him and made no reply to Jorgensen's question: "What are you trying to do to me?"

However, Ulich's testimony was entirely at odds with this version of the incident. He testified that when he entered the dining car the plaintiff was standing with his personal bag on a table, with one hand on the bag, and that when the bag inspection was announced the plaintiff moved back and forth and seemed quite nervous. Ulich testified that the plaintiff then said: "Mr. Ulich, can't you forget this?" and upon receiving no reply from Ulich, the plaintiff then opened his bag and took from within it a small quantity of ham wrapped in a company napkin and placed it on the table. He further testified that Jorgensen then said: "What are you going to do with me?" Olcott corroborated Ulich's testimony that the plaintiff had taken the ham from his bag. Canino's testimony corroborated Ulich's testimony that Jorgensen said: "What are you going to do with me?"

Plaintiff was then taken to the railroad police department office located in the Pennsylvania Station and remained there for approximately two and one-half hours. Jorgensen testified that during this period a union representative who came in to look after his interests was denied permission to do so and told to leave. He also testified that he was refused permission to telephone his wife during this period. This was denied by Ulich.

Jorgensen testified that while he was in the police department office he was asked to make a statement concerning the ham but that the police officers refused to believe his account of the incident and instead ordered him to sign a

resignation. Defendant's witnesses testified that Jorgensen refused to make any statement but had voluntarily offered to resign. Jorgensen signed a resignation which he later repudiated, claiming that it was the product of threats and coercion and that he signed it only to obtain his release.

When he was permitted to leave, Jorgensen turned in his receipts from the trip, meal checks, and his railroad pass and immediately upon leaving the station, spoke to his union representative and told him what had occurred. After speaking to the union representative the plaintiff went to see J. A. Geren, the Superintendent of Dining Car Service, and A. J. Ellis, the chairman of the plaintiff's union, and told each of them what had happened. Plaintiff then engaged an attorney to represent him.

The plaintiff was a member of Lodge No. 162 of the Brotherhood of Railroad Trainmen, the accredited statutory representative of the employees for collective bargaining purposes under the Railway Labor Act, 44 *Stat.* 577 (1926), 45 *U. S. C. A.* §§ 151–188 (1954). A contract regulating the wages, hours and working conditions of the employees, including the plaintiff, was in effect between the Brotherhood and the railroad at this time. The contract provides, *inter alia:*

### "*Rule No.* 6—Discipline.

6–*A*–1. Employes will not be suspended nor dismissed from the service without a fair and impartial trial; neither will they be held off duty for minor offenses pending investigation or decision. Witnesses will be examined separately, but in event of conflicting testimony, those whose evidence conflicts will be examined together. Employes will be notified in writing ten days prior to date suspension takes effect.

\*         \*         \*         \*         \*         \*         \*         \*

6–*A*–3. An employe required to attend investigation may be accompanied by an employe of his own selection, who will be permitted to question witnesses so far as the interests of the employe is concerned."

### "*Rule No.* 7—Appeals

7–*A*–1. An employe who considers that an injustice has been done him, and who has appealed his case in writing to his Superintendent within ten days, will be given a hearing at which he may be accompanied by an employe from the district in which he is

employed to assist him in presenting his case. After his appeal has been acted upon by the Superintendent, he may, if he so desires, be represented before the Superintendent (of the Dining Car Service) and General Superintendent (later changed to Manager, Dining Car Service) by the Committee representing employes covered by these Regulations.

7–B–1. If the charge against the employe is not sustained, it will be stricken from the record. If, by reason of such unsustained charge, the employe has been removed from the position held, reinstatement will be made and payment allowed for the difference between the amount earned while out of service, or while otherwise employed, and the amount he would have earned on the basis of his assigned working hours actually lost during the period."

This agreement and the provisions with respect to grievances were made pursuant to section 2 of the Railway Labor Act, 44 *Stat.* 577 (1926), 45 *U. S. C. A.* § 152 (1954).

On June 18, 1953 Ellis wrote to the defendant company and requested that an investigation and trial be accorded Jorgensen as required by the union contract. On June 22 Jorgensen's attorney wrote to the defendant and repudiated Jorgensen's resignation and requested that he be reinstated.

Pursuant to the request made by Ellis, an investigation was held on June 29, 1953 in accordance with *Rule* 6–A–1. Jorgensen, his attorney and Ellis attended. They were informed by John J. Reilly, who conducted the proceedings, of the charge made by Ulich, and told that the investigation was being held to permit Jorgensen to make an explanation. After some discussion, Jorgensen declined the offer to make an explanation and instead made a short statement of denial. At the conclusion of the hearing it was agreed that a trial would be held on July 3.

On the same day, after the investigation had been concluded, the company sent a registered letter to the plaintiff which confirmed the trial date and set forth the following charge which was to be tried:

"On June 16, 1953, when your personal bag was inspected just prior to your detraining from dining car 7943, train No. 112 at Pennsylvania Station, New York, N. Y., it was found to contain a quantity of ham (company property) wrapped in a company napkin."

On July 3 and 8 a trial was conducted pursuant to *Rule* 6–*A*–1. Reilly was the presiding officer and Jorgensen was represented by his attorney and the union chairman, Ellis. The various witnesses were also present and the testimony was taken stenographically.

At the outset of this hearing, Reilly read the letter of June 29, containing the charge against Jorgensen, into the record and Jorgensen admitted that he had received it. The trial was not completed on July 3, however, and on July 6 another letter was sent to Jorgensen informing him that it would be continued on July 8. This letter also recited the charge for which he was being tried. At the adjourned date, this letter was also read into the record and Jorgensen admitted he had received it.

At the company trial Ulich gave his account of the incident of June 16, which was corroborated by Olcott and Canino as stated above. Jorgensen, in turn, gave his version and the three members of the dining car crew corroborated his account of the events as mentioned above.

The testimony given at the trial below was substantially the same as that given at the company hearing.

On July 22 the following notice was sent to the plaintiff:

"The Pennsylvania Railroad
Notice of Discipline for Offense Occurring
on Dining Car Department
Long Island City, N. Y., July 22, 1953

Name—Carl Jorgensen.    Occupation—Steward.

Home Division—New York Region.

Discipline—Dismissal from the service of the Pennsylvania Railroad Company.

Date of Occurrence—June 16, 1953.

Place—New York.

Outline of Offense:—
'On June 16, 1953, when your personal bag was inspected just prior to your detraining from dining car 7943, train No. 112 at Pennsylvania Station, New York, N. Y., it was found to contain a quantity of ham (company property) wrapped in a company napkin.'

E. H. Fausnaugh,
Supervisor Operations."

On July 27 Ellis, the union chairman, appealed to Geren, the Superintendent of Dining Car Service, pursuant to *Rule 7–A–1*. As a result, Geren conferred with Ellis and Jorgensen on August 4. On August 7 Geren wrote to them and, after referring to their visit in connection with Jorgensen's appeal and quoting the charge against the plaintiff, stated that after reviewing the case he would not change the discipline imposed upon the plaintiff.

On August 8 Ellis wrote to S. N. Phelps, the Manager of the Dining Car Service, requesting an additional appeal from Jorgensen's dismissal. On August 10 Phelps acknowledged the request but pointed out that under *Rule 7–A–1* of the grievance procedure it was necessary to docket the case with Geren, the Superintendent of Dining Car Service, for discussion at one of the union-company monthly meetings; then if the union was still dissatisfied a joint submission might be prepared for the purpose of progressing the case to Phelps. In the letter Phelps suggested that the matter be handled in accordance with the procedure outlined in the collective bargaining agreement. This letter also contained a statement of the charge against the plaintiff. Upon receipt of this information, however, Jorgensen decided to abandon any further appeals under the union contract and instead of continuing his efforts to obtain reinstatement and back pay, he elected to treat his discharge as final and initiated this action for damages for wrongful discharge, defamation and false imprisonment.

The defendant moved to dismiss all counts at the close of the plaintiff's case and again at the end of the entire case. The trial court denied both motions.

With reference to the count for wrongful discharge the trial court, in accordance with the Appellate Division's decision, *Jorgensen v. Pennsylvania R. Co., supra,* submitted the case to the jury on the theory that the plaintiff could maintain the action without exhausting his administrative remedies and that the issue to be decided by the jury was whether the plaintiff was guilty or innocent of the charge.

On the defamation issue, the trial court found as a matter

of law that the defendant was entitled to the benefit of a qualified privilege and that there was no evidence of excessive publication of the charge. However, the court found that a jury question was presented as to whether the charge was published with express malice, and charged the jury:

"The circumstances which would support a finding of actual express malice in the making of the defamatory charge might include a grossly reckless and heedless disregard of the truth or falsity of such charge."

The court also submitted to the jury the issue of whether or not the plaintiff was falsely imprisoned.

The jury returned the following verdicts for the plaintiff: $44,000 compensatory damages for the wrongful discharge; $50,000 compensatory damages for defamation; no cause for punitive damages for defamation; $5,000 compensatory damages for false imprisonment; $5,000 punitive damages for false imprisonment. Subsequently, the trial court reduced the verdict for wrongful discharge to $30,000; and the verdict of $5,000 for punitive damages for false imprisonment was set aside.

Each of the verdicts thus rendered will be considered separately in order to determine their validity.

### WRONGFUL DISCHARGE.

The defendant contends that the denial of its motions at the end of the plaintiff's case and at the end of the entire case to dismiss the count for wrongful discharge was error. It asserts that the only remedy available to the plaintiff was to seek reinstatement and back pay in accordance with the terms of the collective bargaining agreement, and having failed to pursue that remedy the plaintiff cannot maintain an action for damages for wrongful discharge.

The law in regard to the right of a discharged railroad employee to resort to a state court for the recovery of damages for breach of a collective bargaining agreement has been stated in three United States Supreme Court decisions: In *Moore v. Illinois Central R. Co.*, 312 *U. S.* 630, 61 *S. Ct.*

754, 85 *L. Ed.* 1089 (1941), a discharged railroad employee instituted an action in a Mississippi state court for damages asserting that his discharge was in violation of a collective bargaining agreement. After removal of the case to the federal court, the plaintiff recovered a judgment. When the case reached the Supreme Court it was reversed for a reason not pertinent here. However, the court said:

"But we find nothing in that Act [Railway Labor Act] which purports to take away from the courts the jurisdiction to determine a controversy over a wrongful discharge or to make an administrative finding a prerequisite to filing a suit in court." 312 *U. S.* at *page* 634, 61 *S. Ct.* at *page* 756, 85 *L. Ed.* at *page* 1092.

In *Slocum v. Delaware, L. & W. R. Co.,* 339 *U. S.* 239, 70 *S. Ct.* 577, 94 *L. Ed.* 795 (1950), the railroad sought a declaratory judgment in a New York court, interpreting the terms of a collective bargaining agreement in reference to a jurisdictional dispute between unions. The Supreme Court held that the Railway Adjustment Board had exclusive jurisdiction to adjudicate disputes involving the interpretation of collective bargaining agreements but distinguished the *Moore* case by stating:

"Our holding here is not inconsistent with our holding in *Moore v. Illinois Central R. Co.,* 312 *U. S.* 630, 61 *S. Ct.* 754, 85 *L. Ed.* 1089. Moore was discharged by the railroad. He could have challenged the validity of his discharge before the Board, seeking reinstatement and back pay. Instead he chose to accept the railroad's action in discharging him as final, thereby ceasing to be an employee, and brought suit claiming damages for breach of contract. As we there held, the Railway Labor Act does not bar courts from adjudicating such cases. A common-law or statutory action for wrongful discharge differs from any remedy which the Board has power to provide, and does not involve questions of future relations between the railroad and its other employees. If a court in handling such a case must consider some provision of a collective-bargaining agreement, its interpretation would of course have no binding effect on future interpretations by the Board." 339 *U. S.* at *page* 244, 70 *S. Ct.* at *page* 580, 94 *L. Ed.* at *page* 800.

The latest decision in this area is *Transcontinental & West. Air v. Koppal,* 345 *U. S.* 653, 73 *S. Ct.* 906, 97 *L. Ed.* 1325 (1953). There the plaintiff was employed by a

common carrier subject to the Railway Labor Act. The collective bargaining agreement provided that an employee would not be discharged without a fair hearing and provided for two appeals similar to those in the present case. The plaintiff was charged with abuse of a sick leave provision in the contract. He was given a hearing on that charge, found guilty and discharged. He did not appeal from the adverse decision of the hearing officer, but instead brought suit to recover damages for wrongful discharge. The case was submitted to a jury which returned a verdict and dismissed the complaint on the ground that the plaintiff had failed to exhaust the remedies prescribed in his employment contract. Following a reversal of the trial court by the Court of Appeals, the Supreme Court granted *certiorari*.

The Supreme Court reversed the Court of Appeals and affirmed the action of the trial court. After quoting with approval the above cited language of the *Moore* and *Slocum* cases to the effect that the Railway Labor Act does not divest state courts of jurisdiction to adjudicate suits for damages for unlawful discharge, the court held that the substantive law of the state in which the cause of action arose should determine the requirements of the cause of action and the interpretation of the collective bargaining agreement. The opinion concluded:

"The result is that, whereas, under the Railway Labor Act, the Adjustment Board has exclusive jurisdiction to adjust grievances and jurisdictional disputes of the type involved in the *Slocum case*, that Board does not have like exclusive jurisdiction over the claim of an employee that he has been unlawfully discharged. Such employee may proceed either in accordance with the administrative procedures prescribed in his employment contract or he may resort to his action at law for alleged unlawful discharge if the state courts recognize such a claim. Where the applicable law permits his recovery of damages without showing his prior exhaustion of his administrative remedies, he may so recover, as he did in the Moore litigation, *supra*, under Mississippi law.

On the other hand, if the applicable local law, as in Missouri, requires an employee to exhaust his administrative remedies under his employment contract in order to sustain his cause of action, he must show that he has done so." 345 *U. S.* at *page* 662, 73 *S. Ct.* at *page* 910, 97 *L. Ed.* at *page* 1331.

■ Accordingly, under the rule of the *Koppal* case, the New Jersey courts have jurisdiction to adjudicate wrongful discharge cases where an employee seeks damages, and are free to interpret the collective bargaining agreement in light of the substantive law of this State to determine whether such a cause of action may be maintained.

■■ In the absence of a contract or statute, the plaintiff's employment would have been at will and subject to termination with or without cause. *Schlenk v. Lehigh Valley Railroad Co.*, 1 *N. J.* 131, 135 (1948). Consequently, plaintiff's action for wrongful discharge must spring from the rights secured to him as an employee under the collective bargaining agreement, since the plaintiff does not assert the existence of any other contract or statute as the basis for his action. Thus, the issue presented is whether a fair interpretation of the collective bargaining agreement would permit the plaintiff to maintain an action for damages for an alleged wrongful discharge.

■ While the contract does not enumerate specific acts which would constitute grounds for discharge, or even provide that employees may be dismissed for cause, it is evident from a reading of the agreement that dismissals for cause were contemplated by the parties. Even though there is no rule proscribing the conversion of company property, it is clear that such an act, if committed by an employee, would constitute cause for discharge. The intendment of *Rule* 6 of the contract is that an employee will be dismissed only for cause and that he is entitled to a fair and impartial trial to determine that issue. By virtue of this provision the employer has agreed to limit its otherwise absolute right to discharge or discipline its employees. However, this is not the entire agreement. *Rule* 7 of the collective bargaining agreement provides that any employee "who considers that an injustice has been done him" has the right to appeal his case to the Superintendent of Dining Car Service and the right to take an additional appeal to the Manager of Dining Car Service. It provides, further, that if the charge is not sustained at any of these levels,

the charge will be stricken from the record and the employee reinstated with back pay. In addition to these appeals, the employer has the further right to appeal to the National Railway Adjustment Board, under *section* 3 of the Railway Labor Act, 44 *Stat.* 578 (1926), 45 *U. S. C. A.* § 153, which provides:

"(i) The disputes between an employee * * * and a carrier * * * growing out of grievances * * *, shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board [National Railway Adjustment Board] with a full statement of the facts and all supporting data bearing upon the disputes."

In this case Jorgensen was afforded a company hearing upon the charge made against him in accordance with *Rule* 6. The plaintiff does not contend that the hearing was unfair. At that hearing the company tribunal determined that there was sufficient evidence to constitute cause for the dismissal of the plaintiff. After receiving notice of his dismissal, the plaintiff availed himself of the second step in the grievance procedure and appealed his case to the Superintendent, who affirmed his discharge. Then, after an irregular request to invoke the third step in the grievance procedure, the plaintiff decided to abandon his right to any further appeals and elected to treat his discharge as final and instituted this action. He contends that it was not necessary that he exhaust his contractual rights or remedies before seeking judicial relief.

There are no cases in this State that have expressly passed upon the question of whether an employee must first exhaust the remedies provided for in a collective bargaining agreement before instituting an action for wrongful discharge. This question was specifically left open by this court in *Schlenk v. Lehigh Valley R. Co., supra,* 1 *N. J.* at *page* 137, wherein we said:

"* * * [W]e do not deem it necessary to pass on the question raised as to the necessity of the complainant exhausting his remedies before the National Railroad Adjustment Board." 1 *N. J.* at *page* 137.

Nor was this question passed upon by this court in *Marchitto v. Central R. Co. of New Jersey*, 9 *N. J.* 456 (1952). That case involved a controversy between an employee and his union and union chairman. The need for an employee to exhaust his contractual remedies under a collective bargaining agreement before instituting suit against the employer was not involved. The only part of that decision pertinent to the present inquiry was the holding that since there was no "adverse action" or "decision" by the union grievance committee there was no basis for the taking of any appeals or for the exhaustion of any other remedies provided for in the union constitution before seeking judicial relief.

The doctrine of the exhaustion of remedies is well established in New Jersey. *Ward v. Keenan*, 3 *N. J.* 298 (1949). The rule has been applied to members of labor unions or other voluntary organizations seeking reinstatement or damages from the organization, where there has been no showing that resort to the internal remedies provided for in the constitution or by-laws of the organization would be futile, illusory or vain. *Naylor v. Harkins*, 11 *N. J.* 435, 444 (1953); *Marchitto v. Central R. Co. of New Jersey,* 9 *N. J.* 456, 470 (1952); *Siena v. Grand Lodge, etc., Order Sons of Italy*, 11 *N. J. Super.* 507, 517 (*App. Div.* 1951); *Beedie v. International Brotherhood of Electrical Workers*, 25 *N. J. Super.* 269, 273 (*App. Div.* 1953); *Dragwa v. Federal Labor Union*, 136 *N. J. Eq.* 172, 178 (*Ch.* 1945); *Purcaro v. Grand Lodge, etc., Sons of Italy*, 107 *N. J. L.* 82, 83 (*E. & A.* 1930); *Walker v. Pennsylvania-Reading S. S. Lines*, 142 *N. J. Eq.* 588, 599 (*Ch.* 1948); *Smith v. Ocean Castle*, 59 *N. J. L.* 198 (*E. & A.* 1896).

The rule has also been applied to suits arising under the School Laws. *Redcay v. State Board of Education*, 128

*N. J. L.* 281, 285 (*Sup. Ct.* 1942); *Draper v. Comm'rs. of Public Instruction,* 66 *N. J. L.* 54, 55 (*Sup. Ct.* 1901). *Cf. Waldor v. Untermann,* 10 *N. J. Super.* 188, 191 (*App. Div.* 1950).

It has been applied to cases arising under the Civil Service Act where employees claimed to have been illegally discharged. *Keegle v. Hudson County,* 99 *N. J. L.* 26 (*Sup. Ct.* 1923); *Van Sant v. Atlantic City,* 68 *N. J. L.* 449 (*Sup. Ct.* 1902); *cf. Greene v. Hudson County Board of Health,* 19 *N. J. Super.* 453, 458 (*Law Div.* 1952).

It has also been applied to administrative bodies under the Zoning Laws. *Rinhart v. Wright,* 133 *N. J. L.* 374 (*Sup. Ct.* 1945); *Lutz v. Kaltenbach,* 101 *N. J. L.* 316 (*Sup. Ct.* 1925); *Eaton v. City of Newark,* 3 *N. J. Misc.* 363 (*Sup. Ct.* 1925). *Cf. Conaway v. Atlantic City,* 107 *N. J. L.* 404, 408 (*Sup. Ct.* 1931); *Oliva v. City of Garfield,* 137 *N. J. L.* 475, 477 (*Sup. Ct.* 1948), affirmed 1 *N. J.* 184 (1948); *Fischer v. Township of Bedminster,* 5 *N. J.* 534, 542 (1950).

The doctrine has been applied in other jurisdictions to cases where employees sought damages for wrongful discharge under similar collective bargaining agreements. It has generally been held that where the agreement provides grievance procedures for the settlement of controversies of this character an employee must exhaust those procedures before resorting to the courts, in the absence of facts which would justify the failure to pursue such remedies. *Cone v. Union Oil Co. of California,* 129 *Cal. App.* 2d 558, 277 *P.* 2d 464 (*D. Ct. App.* 1954); *Payne v. Pullman Company,* 13 *Ill. App.* 2d 105, 141 *N. E.* 2d 83 (*App. Ct.* 1957); *Harrison v. Pullman Co.,* 68 *F.* 2d 826 (8 *Cir.,* 1934); *Thompson v. St. Louis-San Francisco Ry. Co.,* 113 *F. Supp.* 900 (*D. C. Ala.* 1950); *Mayfield v. Thompson,* 262 *S. W.* 2d 157 (*Mo. App. Ct.* 1953); *Barker v. Southern Pacific Co.,* 214 *F.* 2d 918 (9 *Cir.,* 1954); *Peoples v. Southern Pacific Co.,* 139 *F. Supp.* 783 (*D. C. D. Oregon* 1955), affirmed 232 *F.* 2d 707 (9 *Cir.,* 1956); 31 *Am. Jur., Labor,* § 123. But see, *Moore v. Illinois Central R.*

*Co.,* 180 *Miss.* 276, 176 *So.* 593 (*Sup. Ct.* 1937); *Moore v. Thompson,* 131 *F. Supp.* 665 (*D. C. S. D. Tex.* 1953).

The policy behind this rule was discussed in an article by *Milo Fowler Hamilton, "Individual Rights Arising From Collective Labor Contracts,"* 3 *Mo. L. Rev.* 252, 256 (1938), where it was said:

"The most common defense relied upon in cases where individuals seek relief for violation of collective labor contracts is the failure of the plaintiff, before the institution of the action, to exhaust his remedies provided by the contract. The general rule is that no recovery may be had in such a case unless the remedies provided by the collective contract have been exhausted. This result is founded upon well established principles of the law of contracts, and is solidly supported by the purpose of the collective agreement. If agreements of this character are to fulfill their function of preserving industrial peace and supporting that cooperation between employer and employee which, when the parties have more or less equal bargaining power, is a chief source of economic well being, it is absolutely essential that both parties be left free to determine the constitution of the relationship subject only to the claims of society as a whole. Certainly these agreements would be stultified by permitting either an individual employee or an individual employer to resort to the courts for redress without having first tried to settle the controversy in every way that the collective contract provides."

█ It is true that the doctrine of the exhaustion of remedies is not an absolute rule and is subject to several exceptions in New Jersey. For example, the doctrine has not been applied where the disposition of the matter depends solely on the decision of a question of law, *Nolan v. Fitzpatrick,* 9 *N. J.* 477 (1952); or where the jurisdiction of the administrative tribunal is doubtful, or where the charges asserted are so palpably defective as to make the jurisdiction of the tribunal merely colorable, *Ward v. Keenan,* 3 *N. J.* 298 (1949); or where the administrative remedies are futile, illusory or vain. *Naylor v. Harkins,* 11 *N. J.* 435 (1953). But the plaintiff herein does not assert the existence of any facts which would warrant departure from the general rule under the exceptions noted above. Therefore, we hold the plaintiff was required to exhaust his contractual remedies before resorting to the court.

However, the point is made that since the remedy that the plaintiff seeks—damages—differs from the only remedy available under the collective bargaining agreement and Railway Labor Act, it would be illogical to require the plaintiff to exhaust his contractual remedies. But this contention ignores the fact that the sole basis for the plaintiff's cause of action is the collective bargaining agreement itself. Without this agreement the plaintiff would have no recourse in the event he was discharged with or without cause. We are of the opinion that even if the doctrine of exhaustion of remedies were not applicable, a reasonable interpretation of the union contract would limit the plaintiff to those rights specified in the contract.

*Rule* 7 of the agreement, in conjunction with the provisions of the Railway Labor Act, embodies a complete system of appeals designed to protect and implement the rights conferred upon an employee under *Rule* 6 and provide a specific remedy—reinstatement with back pay—in the event an employee was improperly discharged. We think it is reasonable to conclude that *Rules* 6 and 7 of this contract and the Railway Labor Act were intended to grant the employee freedom from dismissal without cause, and to that end provided a complete grievance procedure designed to implement the employee's rights under *Rule* 6 by compelling the employer to reinstate with back pay any employee discharged without sufficient cause. Since the plaintiff's right of redress for a wrongful discharge is created solely by the contract that right is circumscribed by the procedures specified therein to effectuate it. This view was clearly stated in *Payne v. Pullman Co.,* 13 *Ill. App. 2d* 105, 141 *N. E. 2d* 83, 89 (*Ill. App. Ct.* 1957). In that case a railroad employee was charged with making advances toward a woman passenger and after being afforded a hearing in accordance with the collective bargaining agreement, which contained provisions similar to those in the present case, was dismissed. He took one appeal to the designated official who sustained the dismissal, and then abandoned his right to further appeals and instituted a suit for damages for

wrongful discharge. The court, after holding that the plaintiff was required by the law of Illinois to exhaust his administrative remedies before seeking damages, then stated:

"But if the law were otherwise, we are of the opinion that the collective agreement limits the plaintiff to the procedure provided for in the agreement. The purpose of these provisions in a collective bargaining agreement are well known. Without contractual protection an employee could lose his means of livelihood at the whim of the employer. There was and is no protection in law save that which the contract provides. The cruelty and severity of an arbitrary and unfair discharge came to be recognized, and to mitigate this evil the collective bargaining agreement set up a complete plan. It recites in general terms the requirements for the discharge of an employee who has passed the probationary period. The employer's right to discharge for just cause is recognized and the employee's right to continuance of his employment, unless there is just cause for his dismissal, is also recognized. The provisions are not, however, the kind which would be written into a contract contemplating a trial by court or jury. They are couched in general and ambiguous terms, but are given practical implementation by the establishment of a complete system of arbitrament, that is, a fair hearing before an operating official, an appeal to a superior of high rank and, finally, to a body composed of ten members—five union and five carriers, and in the event of a deadlock, an eleventh neutral. It is a fair arrangement for the protection of plaintiff's rights. To interpret this agreement to mean that an employee could, at any stage of the proceedings, discontinue such proceedings and still resort to the courts would be unreasonable. We conclude that a fair interpretation of the contract is that the provisions with respect to grounds for discharge are confined in their implementation to the plan of arbitrament established by the contract."

We think that where an employee has been dismissed after charges have been preferred against him and a hearing granted on those charges, pursuant to the terms of a collective bargaining agreement, his rights and remedies are limited to those afforded under the union contract and the Railway Labor Act. The correlative rights and duties of the parties are governed by the contract which embodies the grievance procedures. The employer can dismiss an employee only in accordance with the provisions of the contract and is bound to extend to an aggrieved employee the right to resort to the applicable grievance procedures. An employee who seeks to enforce his rights under the contract must

also accept its obligations. *United States Steel Corp. v. Nichols*, 229 *F*. 2d 396, 402 (6 *Cir.*, 1956). The provisions of *Rules* 6 and 7 of the collective bargaining agreement were designed to give an employee job security, in the sense that he would be protected against dismissal other than for cause. The separate provisions of a collective bargaining agreement cannot be construed and enforced without considering the purpose and context of the entire agreement. *Rule* 6 of this contract was not intended to create an independent actionable right standing alone. It must be read in conjunction with *Rule* 7, which was intended to implement and protect the right granted under *Rule* 6. Read together they contain a plan designed to effectuate the primary purpose of the parties to the contract; to afford job security to employees within the realities of the contractual situation, and to this end provide the remedy of reinstatement and back pay in the event the employee has been disciplined without cause. An employee cannot elect to accept the benefit conferred upon him without being bound to pursue the remedies provided for therein, in the absence of a showing that resort to those remedies would be futile. Since the employee's right to freedom from discharge without cause arises solely from the union contract, if he seeks redress for a breach thereof, should he not be bound to pursue the remedies provided for therein, which were designed to implement that right?

We conclude that a proper interpretation of the collective bargaining agreement limits the employee to the rights and remedies specified therein. If the employee is not so limited, any employer who seeks to discipline an employee would do so at the peril of being subjected to a suit for damages despite the fact that the employer complied with all the procedures contained in the agreement and without any showing by the employee that it would have been futile to pursue his contractual rights. We are confident that such a result was not within the contemplation of the parties to the agreement. Accordingly, we find no merit in the plaintiff's contention that he may maintain an action for damages

for wrongful discharge without resort to the contractual remedies because the remedy he seeks differs from the one available under the collective bargaining agreement or the Railway Labor Act.

Since the plaintiff failed to exhaust his contractual remedies and in view of our interpretation of the collective bargaining agreement, the judgment rendered below upon the count for wrongful discharge is reversed with a direction to dismiss said count.

## DEFAMATION.

It should be noted at the outset that we do not consider the dismissal of the plaintiff's cause of action for wrongful discharge as being determinative of the counts for defamation. The company hearing and subsequent appeal therefrom did not uncontrovertably establish the truthfulness of the alleged defamatory statements. The determination by the company tribunals that there was sufficient evidence to constitute cause for the plaintiff's dismissal is not tantamount to a conviction of the crime of larceny or attempted larceny in the criminal sense. The degree of evidence and burden of proof are quite different in a criminal proceeding. Consequently, we will not pass upon the question of whether or not the truth of the innuendo alleged was proved by the defendant.

The second count of the complaint alleges by way of innuendo that the defendant's letter of June 29 charged that the plaintiff had committed or was in the act of committing the crime of larceny. This letter, as quoted earlier in this opinion, contained the following charge:

"On June 16, 1953, when your personal bag was inspected just prior to your detraining from dining car 7943, train No. 112 at Pennsylvania Station, New York, N. Y., it was found to contain a quantity of ham (company property) wrapped in a company napkin."

The letter was sent to Jorgensen at the conclusion of the investigation hearing which was held in response to his demand that a trial be held in accordance with the grievance procedure outlined in the union contract. The charge was

also set forth in the defendant's letters to Jorgensen of July 6, which informed him of the adjourned trial date, and of July 22 which formally notified him of his discharge. The charge was again repeated in the letter of August 7 denying relief on appeal. A copy of this letter was sent to A. J. Ellis, the union chairman who had represented Jorgensen on the appeal. The letter of August 10, which also recited the charge, was in response to Ellis' request for an additional appeal and hence was mailed directly to Ellis. It recited the charge against Jorgensen and specified the proper procedure to secure the next appeal from the dismissal. At the outset of each of the hearings on July 3 and July 8, one of the letters was read into the record in the presence of two company representatives, who conducted the proceedings, plaintiff's counsel, the reporter who recorded the testimony, Ellis and some of the witnesses. At the trial the plaintiff introduced testimony by Ellis to the effect that there was widespread "discussion" of the charge against the plaintiff prior to the company hearing; that he overheard groups of cooks, stewards and office workers discussing the charge in various places, including union meetings. The plaintiff, his wife and son also testified that they received anonymous telephone calls concerning the charge.

The defendant urges on this appeal that (1) a qualified privilege existed which justified the limited publication of the charge; (2) there was no evidence of excessive publication of the charge; (3) there was no proof of express malice or bad faith or that the defendant was motivated by any other consideration except an honest belief in the truthfulness of the charge; (4) defendant was entitled to rely upon the statements of its agents in whose truthfulness it had confidence and such reliance was not evidence of bad faith.

■ There is little doubt that the import of the writings in question is that the plaintiff had stolen or was in the act of stealing company property. Such written statements are on their face libelous *per se*. *Jorgensen v. Pennsylvania*

R. Co., 38 N. J. Super., supra, at page 343; Murphy v. Johns-Manville Products Corp., 45 N. J. Super. 478, 488 (App. Div. 1957); 33 Am. Jur., Libel and Slander, § 31 (1941); 53 C. J. S. Libel and Slander § 53 (1948). However, the defendant asserts that under the circumstances of this case the publication of the libelous matter was qualifiedly privileged and points out that the trial court found as a matter of law that a qualified privilege did exist. We concur in the conclusion reached by the trial judge in this respect.

It is established law in this State that "a communication, made bona fide, upon any subject-matter in which the party communicating has an interest, or in reference to which he has a duty, is privileged, if made to a person having a corresponding interest or duty, although it contain criminatory matter which, without this privilege, would be actionable." Rothholz v. Dunkle, 53 N. J. L. 438, 440 (E. & A. 1891); King v. Patterson, 49 N. J. L. 417, 422 (E. & A. 1887). It has also been said: "A communication is qualifiedly privileged where circumstances exist, or are reasonably believed by the defendant to exist, which cast on him the duty of making a communication to a certain other person to whom he makes such communication in the performance of such duty, * * *." Finkelstein v. Geismar, 91 N. J. L. 46, 48 (Sup. Ct. 1917); affirmed 92 N. J. L. 251 (E. & A. 1918).

The defendant was under a duty to communicate the libelous matter here under consideration. That duty is readily ascertainable by reference to the provisions of the Railway Labor Act and the collective bargaining agreement, executed pursuant thereto, which obligated the defendant to comply with Jorgensen's demand for a hearing. Jorgensen v. Pennsylvania R. Co., supra, 38 N. J. Super. at page 344. The defendant, accordingly, was entitled to the protection of a qualified privilege when it published the charge in the letters mentioned above and at the hearing. However, the plaintiff asserts that if a qualified privilege existed it had been abused by excessive publication of the libelous charge.

We cannot agree. The burden of proving excessive publication is on the plaintiff. *Prosser on Torts* (*2d ed.* 1955), § 95, *p.* 629. Certainly, the defendant had the right to publish the charge in the notices which were sent to Jorgensen specifying the hearing dates and in the letter which informed him of the results of the hearing. The letters which were sent to the union chairman Ellis, who represented Jorgensen at the hearing and the appeals, were within the scope of the privilege. For a similar application of the rule of qualified privilege see *Murphy v. Johns-Manville Products Corp., supra,* 45 *N. J. Super.* at *pages* 490, 492. See also *Butterworth v. Todd,* 76 *N. J. L.* 317 (*Sup. Ct.* 1908); *Ramsdell v. Pennsylvania R. Co.,* 79 *N. J. L.* 379 (*Sup. Ct.* 1910); *Prosser, Law of Torts* (*2d ed.* 1955), § 95, *p.* 614 *ff;* 33 *Am. Jur., Libel and Slander,* §§ 89 *et seq.,* 107, *pp.* 143 *et seq.,* 184 (1948); *Annotations,* 20 *A. L. R. 2d* 421, 474; 20 *A. L. R. 2d* 531, 575 (1951). It cannot be denied that as a union official who actively represented the plaintiff that Ellis had a sufficient interest in the matter, from the standpoint of union-management relations, to justify the publications made to him. *Murphy v. Johns-Manville Products Corp., supra,* 45 *N. J. Super.* at *page* 493. Nor did the reading of the charge into the record at the hearings abuse the occasion. The record reveals no instances of publication of the written charges to any one other than those who might be reasonably expected to be so informed in the pursuit of the grievance procedures invoked by the plaintiff.

In regard to the testimony by Ellis, the plaintiff and his family, as to the extensive discussion and dissemination of the charge against the plaintiff, there is no evidence to indicate that the defendant was responsible for such discussion and dissemination. At the time of the incident several employees were present in the dining car. In absence of proof connecting the defendant with such publication it is probable that the discussion regarding the incident originated with those employees. It is likewise probable that the dissemination of the outcome of the hearing

similarly originated with the employees who were witnesses at the hearing. While the plaintiff has shown that there was publication of the charge, he has failed to establish that the defendant was in any way responsible for such publication. A mere showing of extensive publication without proof tending to connect the defendant with such publication is not sufficient to destroy the qualified privilege that existed.

The question remains, however, as to whether the privilege had been destroyed by proof that the charge had been published in bad faith or with express malice or without a reasonable belief in its truth. *Jorgensen v. Pennsylvania R. Co., supra,* 38 *N. J. Super.* at *page* 345. The privilege having been established the burden was upon the plaintiff to show its abuse. *Fahr v. Hayes,* 50 *N. J. L.* 275, 279 (*Sup. Ct.* 1888).

At the trial below the defendant sought to prove its reasonable belief in the truth of the charge and that neither it nor its agents were motivated by any desire other than to exercise the company's right of discipline in good faith in publishing the charge against the plaintiff. Ulich, who initiated the complaint, and the two other agents of the defendant who were present on June 16, when the incident which gave rise to the charge occurred, each testified as to the basis for their belief in its truth. The plaintiff offered no evidence to show that any of these agents of the defendant were motivated by any hostility or personal enmity toward the plaintiff. But the plaintiff asserts that evidence of express malice arises from the fact that the defendant was "reckless or grossly negligent" in relying solely upon the statements of its agents in publishing the charge, and further relies upon a statement allegedly made by Geren to Ellis referring to the plaintiff as a thief.

While we are in accord with the view that there are no sound policy reasons for conferring immunity upon a reckless defamer who blasts an innocent reputation without making any attempt to verify his statements, *Prosser on Torts* (*2d ed.* 1955), § 95, *p.* 628, it cannot be said that the de-

fendant was reckless or grossly negligent in making the charge complained of. The defendant relied upon the statements of its agents whose duty it was to make inspections of the type here involved and to report their findings to their superiors. It would not appear to be unreasonable for an employer to rely upon the truthfulness of the reports of its own agents whose duties included spot check inspections of employees such as that involved herein. It would be quite unreasonable to say that an employer should disbelieve the statements of agents upon whose truthfulness he should be entitled to rely. The fact that the defendant chose to rely upon the veracity of those persons entrusted with the duty of detecting and reporting suspect activities by company employees cannot be considered as evidence of express malice on the employer's behalf. In this regard it has been held that where a publisher relies upon the statement of a single person in whose truthfulness he has confidence, and who apparently speaks of what he knows, without attempting to verify the statement by further inquiry of other parties, affords no ground for concluding that such action was not taken in good faith. *Johnson v. Marsh,* 82 *N. J. L.* 4, 7 (*Sup. Ct.* 1911). It is our opinion that the defendant acted reasonably under the circumstances, having due regard for the strength of its belief and the grounds which supported it. See *Prosser on Torts* (*2d ed.* 1955), § 95, *p.* 628.

The record is devoid of any other evidence of express malice except the statement alleged by Ellis to have been made by Geren on June 16. Ellis testified that after he learned of the incident involving the plaintiff that he called on Geren to determine what specifically had occurred, and that during the discussion Geren said: "Mr. Jorgensen is a thief. Do you want to defend a thief?" Geren denied making any such statements.

It is essential in determining the effect of this evidence to clarify the purpose for which it was admitted. This testimony was not adduced at the first trial of the case and was not the basis of a separate cause of action for slander at

the second trial. It was admitted solely for the purpose of showing the existence of express malice toward the plaintiff in publishing the defamatory charge against him.

Express malice has been defined as "some motive, actuating the defendant, different from that which *prima facie* rendered the communication privileged, and being a motive contrary to good morals." *Fahr v. Hayes, supra,* 50 *N. J. L.* at *page* 279. In that case it was expressly noted that even if a defendant feels indignation toward a plaintiff for his supposed crime, he will not necessarily forfeit his qualified privilege. There the defendant had been informed that the plaintiff had stolen some gold chains from the defendant's firm and had been arrested. Shortly thereafter a third person to whom the plaintiff had applied for credit sought to verify the plaintiff's trustworthiness with the defendant who made the following remarks to the plaintiff in the presence of the third party and others: "You thief, you! Don't you show your face in Maiden Lane any more. You stole two chains from my factory, and you are indicted." The court, after finding that a qualified privilege existed, made the following comment as to the existence of any other motive contrary to good morals 50 *N. J. L.* at *page* 280:

"The language used by the defendant fairly discloses another motive than the imputed one, not indeed inconsistent, but rather conjoined with it, *viz.*, indignation towards the plaintiff for his supposed crime. This motive, however, is not contrary to good morals, and therefore, cannot be ranked as malicious *per se* * * *."

It must be borne in mind that Geren's alleged statement was not itself actionable but was admitted solely as evidence of the defendant's actual malice toward the plaintiff in later publishing the libelous charge heretofore referred to. It would appear that Geren's statement would tend more to evince his belief in the truth of the charge and indignation as a result of that belief rather than to indicate that it was the underlying malicious motive for the written publication of the charge later made against Jorgensen. Geren's statement was made on June 16, but the charge was not published

until after the plaintiff had requested a hearing and was afforded a preliminary investigation which was held on June 29. Geren's oral statement cannot be assigned as the motive for the publication of the written charge on June 29. As mentioned above, the charge was based upon the report of Ulich and was published in response to Jorgensen's request for a hearing in accordance with the union contract. Under these circumstances we fail to see how Geren's statement of June 16 can be said to have been the motive or to constitute evidence of express malice for the publication of the alleged libel on June 29. Whatever Geren's motive may have been in making the alleged defamatory remarks above quoted, the only question now before this court is to determine the primary motive or purpose which inspired the defendant's publication of the libelous charge on June 29, 1953. Since the record reveals no other evidence of express malice toward the plaintiff, it does not appear that the publication by defendant was motivated by any desire other than a reasonable belief in the truthfulness of the charge.

In our opinion there was not sufficient evidence of an abuse of the qualified privilege to justify submission of that issue to the jury. "Where the case is clearly or admittedly one of qualified privilege, and there is no evidence, or not more than a scintilla of evidence, of malice, it is the duty of the trial judge to withdraw that issue from the consideration of the jury." *Murphy v. Johns-Manville Products Corp., supra,* 45 *N. J. Super.* at *page* 495. Accordingly, we hold that the trial court erred in concluding that a jury issue was present. The judgment for the plaintiff on these counts is reversed and set aside.

What has been said in regard to the libel counts applies equally to the count for slander. The verdict for defamation included both the libel and slander counts.

## FALSE IMPRISONMENT.

From our examination of the record with respect to the false imprisonment count we think there was sufficient

evidence to submit to the jury the question whether there was an unlawful restraint of plaintiff's liberty. The law is stated in *Earl v. Winne*, 14 *N. J.* 119, at *page 127* (1953):

> "The essential thing is the constraint of the person. This constraint may be caused by threats as well as by actionable force, and the threats may be by conduct or by words. If the words or conduct are such as to induce a reasonable apprehension of force and the means of coercion is at hand, a person may be as effectually restrained and deprived of liberty as by prison bars. Unless it is clear that there is no reasonable apprehension of force, it is a question for the jury whether the submission was a voluntary act, or brought about by fear that force would be used. No doubt cases may arise where it will be a question of difficulty to determine how far the free will of the plaintiff was overcome but that determination rests with the jury. *Hebrew v. Pulis*, 73 *N. J. L.* 621, 624 (*E. & A.* 1906)."

Assuming the existence of probable cause for the initial detention of the plaintiff, the jury was justified in finding that the actions of defendant's agents exceeded those which were necessary for the conduct of the type of investigation being undertaken. *Prosser on Torts* (2d ed. 1955) § 24, p. 103. The evidence that plaintiff was held incommunicado by the defendant's agents and the other acts testified to support the jury's verdict.

The judgment below awarding $5,000 for false imprisonment to plaintiff is affirmed and in all other respects the judgment below is reversed.

WEINTRAUB, C. J. (concurring). I cannot relate the doctrine of exhaustion of administrative remedies to the case before us. If plaintiff sued for reinstatement, the concept would be pertinent. But he here seeks money damages, a remedy he could not obtain administratively. That being so, what is gained by exhausting the administrative process? If plaintiff prevailed in that process, his relief would be reinstatement with net back pay and this he does not seek. If the administrative hearings went against him, could he nonetheless sue for damages? If he could, then there is no point in requiring him to pursue the adminis-

trative remedy of reinstatement. If he could not, it would be because his *sole remedy* is reinstatement with back pay. I think the real question is whether the employee's remedy is thus limited, and for the answer we must look to the contract.

If the contract expressly stated the employer shall not discharge except for good cause, and then provided for an administrative remedy of reinstatement, it could be argued the administrative remedy was intended to be in addition to the legal remedy of damages at the option of the employee, rather than the exclusive mode of redress. But here we have no provision which could be so construed. Rather the limitation on the right to discharge appears in *Rule 6–A–1*, as follows:

"Employees shall not be suspended nor dismissed from the service without a fair and impartial trial. * * *"

Thus the restriction upon the right to discharge is only that it will not be exercised "without a fair and impartial trial."

No doubt "a fair and impartial trial" imports a reasonable cause for dismissal (whether restricted to what the law would regard as just cause need not here be considered); but the element of "cause" is an ingredient of "a fair and impartial trial" and may not be severed from it and isolated and thus set up as a separate limitation upon the right to dismiss, to be vindicated in an action for damages upon a claim that the alleged "cause" is factually untrue. Rather an action at law, if one is at all possible, would have to be based upon a charge that a fair and impartial trial was denied, either in the procedural aspect or in the substantive (*i. e.,* that the facts as charged are insufficient to justify dismissal). No such claim is here made.

I read the contract to provide that the employer curtails its right to discharge only to the extent of agreeing that an employee shall receive the prescribed trial and reinstatement with back pay. They are the employee's *sole right*

and *sole remedy*. The parties did not contract for anything else. It is one thing to condition the right to dismiss upon hearing with reinstatement and back pay; it is quite another to condition it upon the existence of legal cause and thus to invite a suit for damages with the attendant uncertainty as to amount. In short, plaintiff seeks to sue for breach of a promise not to dismiss except for cause, and there is no such unqualified promise in the agreement. And doubtless the contract was framed as it is to serve the wholesome purpose that these controversies be settled by a process which will bring to bear the intimate appreciation of labor-management problems possessed by those designated to sit in judgment.

Except as herein stated, I join in the majority opinion.

HEHER, J. (dissenting in part). I concur in the reasoning and conclusion of the opinion, save as to the holding that there was sufficient evidence to sustain the submission to the jury of the "question whether there was an unlawful restraint of plaintiff's liberty." I find no tangible basis in the evidence for the conclusion that there was "constraint of person," either by conduct or by words, such as would "induce a reasonable apprehension of force." There was a discussion of the circumstances attending the transaction, welcomed by the plaintiff as an opportunity for self-defense. There was no arrest and no imprisonment. And there is no suggestion in what was done of an intention to impose confinement; quite the contrary. The course taken cannot reasonably be regarded as a "holding" of the plaintiff "incommunicado" in the sense of constraint of the person.

I would reverse the judgment *in toto*.

*For affirmance in part and reversal in part*—Justices WACHENFELD, BURLING, JACOBS and PROCTOR—4.

*For reversal in toto*—Justice HEHER—1.

WEINTRAUB, C. J., concurring in result.