Ronald FREGARA, Plaintiff,

v.

**JET AVIATION BUSINESS JETS and Agents Richard Kunert and Edward Baillif, Defendants.**

**Civ. A. No. 89–3788.**

United States District Court,
D. New Jersey.

May 28, 1991.

William F. Koy, Ullman, Holtzman & Koy, Morristown, N.J., for plaintiff.

Stanley L. Goodman, Grotta, Glassman & Hoffman, P.A., Roseland, N.J., for defendants.

## OPINION AND ORDER

POLITAN, District Judge.

This matter comes before the court on defendants' motion for the entry of summary judgment dismissing all seven counts of plaintiff's complaint. I heard oral argument on February 25, 1991 and reserved decision. For the reasons outlined herein, defendants' motion is GRANTED.

Plaintiff, Ronald Fregara ("Fregara"), instituted this action by filing a seven count complaint on September 8, 1989. Fregara alleges in the first through fourth counts that Jet Aviation Business Jets, Inc. ("Jet") and its agents Richard Kunert and Edward Baillif ("plaintiff's former supervisors") breached oral and written contracts of employment, including an oral contract for lifetime employment, when Fregara's employment as an aircraft maintenance coordinator was terminated by Jet on or about August 29, 1988.

In his fifth count, Fregara contends that defendants negligently discharged him by breaching a "covenant of good faith and fair dealing". In his sixth count, Fregara alleges that the individual defendants Kunert and Baillif "acting as individuals for their own purposes, entered into a conspiracy" to harass, threaten and ultimately discharge him. Finally, in his seventh count, Fregara maintains that the defendants intentionally inflicted emotional distress upon him.

Jet is engaged in the business of managing corporate aircraft, including supplying flight and administrative personnel, as was its predecessor, Executive Air Fleet ("EAF"). EAF hired Fregara on or about November 21, 1981 as a maintenance coordinator. Fregara was responsible for the maintenance, record keeping and budgets for a group of aircraft managed by EAF. The actual hands-on maintenance of the aircraft was largely performed by contractors, under Fregara's guidance and direction. Fregara was one of approximately

ten maintenance coordinators employed by EAF.

Fregara alleges that he was employed pursuant to an "oral contract". He maintains that the contract was established by the oral representations of management for a career opportunity and continuous employment. Fregara also testified at his deposition that he was given an employee handbook when he was hired in November of 1981. (See Fregara deposition I at p. 24).[1] Defendant EAF apparently published and distributed an employee handbook to all new employees, including the plaintiff. Plaintiff contends that the handbook outlined EAF's personnel policies, including its policy of terminating employees "for just cause only". In sum, plaintiff maintains that the employee handbook/manual forms the basis of a contract of employment. Plaintiff also argues that the employee handbook established company policies and practices concerning employment and career expectations as well as the covenant of good faith and fair dealing.[2] Defendant asserts that the company handbook was rescinded by Executive Air Fleet late in 1983. (See Cash deposition at pp. 126–127). Roberta A. Cash, Jet's Vice President of Human Resources, testified that, after EAF withdrew the handbook, it was no longer distributed to newly hired employees. (Cash deposition at p. 129). Thus, defendant contends that from 1983 until the termination of plaintiff's employment in August 1988, there was no handbook or written company policy addressing the issue of job security. (Cash deposition at pp. 126–130). Plaintiff disputes whether the company handbook was ever "officially rescinded" by EAF in 1983. In support of this contention, plaintiff emphasizes the fact that defendant never produced a disclaimer or notice evidencing that the handbook was rescinded by the company. Fregara contends that the "rescinding memo"

could not be located because one was never issued.

In early 1986, there was a reorganization of the maintenance department at EAF. Richard Kunert became manager of base maintenance and Ed Baillif, who had been a maintenance coordinator, was promoted to senior coordinator and acted as Fregara's direct supervisor. On March 13, 1987, Kunert gave Fregara a "letter of counselling" detailing several performance problems which Kunert and Baillif observed in his work. Fregara acknowledged these problems at his deposition:

Q. ... before you received this document, had you discussed any of the matters that are described in the document with either Rich Kunert or Ed Baillif?

A. No. The only thing we might have discussed was the insubordination action towards supervisors. The other things speak for themselves, call out different incidents which I agree happened, more or less incidents that happened, but I think it was generated mainly by the last item. (Plaintiff's deposition I at p. 49).

As a result of the incidents detailed in the March 13, 1987 letter of counselling, Fregara was suspended for a day with pay and was enrolled in a two month program of supervisory counselling in an effort to improve his performance. Fregara acknowledged this counselling program by countersigning a memorandum. (See Exhibit 6 of plaintiff's deposition transcript). Defendant contends that, notwithstanding this counselling program, plaintiff's performance continued to decline.

On June 30, 1987, Fregara allegedly violated company policies and FAA regulations by releasing an aircraft for flight notwithstanding an eliminated warning light. A document entitled Minimum Equipment List ("MEL") exists for each type of aircraft. The MEL which is filed

---

**1.** References are to the pages of the transcripts of plaintiff's deposition, which is in two volumes ("Fregara deposition I" or "Fregara deposition II"), and to the exhibits described in plaintiff's deposition, as well as the deposition of Roberta A. Cash ("Cash dep."), Jet's Vice President of Human Resources.

**2.** Plaintiff posits that the handbook provided that employees would be treated fairly, would not be harassed and would be evaluated in a fair and just manner.

with FAA, lists all of the items which may be inoperable on an aircraft without requiring that the aircraft be grounded for repairs. (Plaintiff's deposition I at p. 68).[3] Although Fregara concedes that the warning light is not listed on the aircraft's MEL, Fregara nonetheless released the aircraft for flight. (Plaintiff's deposition I at pp. 68–69). Subsequently, the flight was stopped in mid-take-off by Kunert, who directed Fregara to determine and repair the problem. (Plaintiff's deposition I at pp. 61–62). As a result of this incident, Fregara was given a three day suspension without pay and was placed on another six months probation. This probationary period also involved additional supervisory counselling. (Plaintiff's deposition I at p. 64).

Defendant contends that, on December 31, 1987, Fregara allowed an uninsured pilot, who was inspecting an aircraft for a prospective purchaser, to taxi the aircraft. Fregara was apparently reprimanded for this violation of company rules and warning letter was placed in his file.

In May 1988, Fregara received his evaluation for the period of November 1986 to November 1987. In previous years, Fregara had received his evaluations soon after the end of the period under evaluation. On this occasion, Fregara asked for and was given an "addendum" which evaluated his performance from November 1987 until the delivery of the evaluation.

Both the evaluation and the addendum reflected management's poor opinion of Fregara's performance. Notwithstanding the prior warnings and disciplinary actions, Fregara testified that he was surprised that EAF felt he was performing poorly. (Plaintiff's deposition I at p. 91). Fregara

discussed his poor evaluation with several management officials but they refused to change the evaluation.[4]

Fregara's 1988 evaluation, prepared by Kunert, concluded with the following comments:

Therefore, in light of your last year's performance, I must inform you that you are on a six month performance evaluation commencing 5/19/88. Every thirty days there will be a review of your performance by your supervisor and myself. A written record of these reviews will be compiled. If during this review period your actions in any way jeopardize the safety and/or the business integrity of the EAF/client relationship, you will be subject to immediate termination.

Fregara's employment with EAF was finally terminated on August 29, 1988. Fregara was discharged in part because he refused to sign (i.e., to acknowledge receipt of) a memorandum dated July 27, 1988 which reflected the topics discussed at the second of the six counselling sessions established in the 1988 evaluation. (Plaintiff's deposition I at p. 110). Fregara stated at his deposition that, when Kunert asked him to sign the memo, he refused and the ensuing discussion "got pretty loud ...". (Plaintiff's deposition I at p. 113).

During this same time period, Kunert also learned that at a recent aircraft inspection, Fregara had "signed off" on several items (i.e., certified the flight worthiness of the aircraft) when the inspecting mechanic had determined that repairs were necessary. Fregara allegedly violated company policy by "signing off" on these items without either having the repair done or documenting the reasons why he believed the repair was not necessary. (Plaintiff's dep-

**3.** Chapter 87, Part 91, § 91.30 of the FAA General Operating and Flight Rules provides, in pertinent part:

(a) ... no person may take off an aircraft with inoperative instruments or equipment installed unless the following conditions are met:

(1) An approved Minimum Equipment List exists for the aircraft;

\* \* \* \* \* \*

(5) The aircraft is operated under all applicable conditions and limitations contained in

the Minimum Equipment List and the letter authorizing the use of the List.

**4.** In 1986, Fregara's evaluation was amended to reflect a higher level of performance after he complained to the supervisor who had written the evaluation (Kunert's predecessor) about the unsatisfactory rating he was given. (Plaintiff's deposition I at pp. 41–42).

osition I at pp. 125–126; Exhibit 15 thereto).

Defendant alleges that plaintiff's continued failure to properly perform his duties, together with his refusal to acknowledge the poor level of his performance and his failure to benefit from counselling, led to its decision to discharge the plaintiff. On August 29, 1988, Charlie Beaton, the Director of Maintenance, terminated plaintiff's employment. The termination letter given to Fregara provides, in pertinent part:

> Over the eighteen months your supervisor and your manager have evaluated your performance as insufficient to meet the requirements of a maintenance coordinator. They have worked closely with you monitoring your performance; attempting repeatedly to bring your performance up to an acceptable level. However, it has become apparent that you have not put forth the effort necessary to correct the problems of the last eighteen months. The excess of time spent by your supervisor and manager diverts their attention to the ongoing business. After careful review I have determined that you cannot or will not improve your performance and, I cannot support a continued drain on the energies of the supervisory staff of this department. Therefore, based on your inability to perform to Jet Aviation Executive Air Fleet's standards it has become necessary to terminate your position effective August 29, 1988.

(See Exhibit 16 to plaintiff's deposition transcript).

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R. Civ.P. 56(c). The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Adickes v. S.H. Kress and Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). In testing whether the movant has met this burden, the court must resolve all ambiguities against the movant. *Lopez v. S.B. Thomas, Inc.*, 831 F.2d 1184, 1187 (2d Cir. 1987) (citing *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962)). The movant may discharge the burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The non-moving party then has the burden of demonstrating "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The non-movant must "do more that simply show that there is some metaphysical doubt as to the material facts." *Matshuhita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact.

## ORAL CONTRACT OF EMPLOYMENT

■ Fregara alleges, in his first and third counts, that he had an enforceable oral contract of employment with the defendant. The leading case in New Jersey on "life-time contracts" is *Savarese v. Pyrene Manufacturing Co.*, 9 N.J. 595, 89 A.2d 237 (1952). *Savarese* establishes the general rule as follows:

> ... in the absence of additional express or implied stipulations as to duration, a contract for permanent employment, for life employment or for other terms purporting permanent employment, where the employee furnishes no consideration additional to the services incident to the employment, amounts to an indefinite general hiring terminable at the will of either party, and therefore, a discharge without cause does not constitute a breach of such contract justifying recovery of money damages therefore.

*Id.* at 600–601, 89 A.2d 237.

As *Savarese* demonstrates, there has been a marked reluctance by the courts to enforce this type of contract, mainly because the obligations it contains are primarily one-sided:

Agreements of this nature have not been upheld except where it most convincingly appears it was the intent of the parties to enter into such long range commitments and they must be clearly, specifically and definitely expressed. Only then is it grudgingly conceded that not all such contracts are 'so vague and indefinite as to time as to be void and unenforceable because of uncertainty or indefiniteness.' *Id.* at 601, 89 A.2d 237 (quoting 56 C.J.S., *Master and Servant*, § 6, P. 70; 1 *Williston on Contracts*, § 39 P. 110; 135 A.L.R. 646, *et seq.*).

In *Shebar v. Sanyo Business Systems Corp.*, 111 N.J. 276, 544 A.2d 377 (1988), the Supreme Court of New Jersey distinguished a promise to discharge only for cause from a life-time contract. *Id.* at 287, 544 A.2d 377. "The [former] protects the employee only from arbitrary termination" while the latter protects an employee from *any termination. Id.* (emphasis supplied). In order to determine the type of contract the parties intended, a court must closely examine the terms of the contract and the surrounding circumstances. *Id.* To the extent that Fregara alleges a promise of discharge only for cause, his breach of contract claim must be analyzed by those contractual principles that apply when the claim is one that an oral employment contract exists. *Id.* at 288, 544 A.2d 377. *See, e.g., Shiddell v. Electro Rust–Proofing Corp.*, 34 N.J.Super. 278, 112 A.2d 290 (App.Div.1954).

■ Where such long range employment contracts are sued upon, the intention of the parties to make such a contract must be clearly, specifically and definitely expressed, and the intent of the parties may be ascertained from the language employed, from all attending circumstances, and from the presence or absence of consideration from the employee additional to the services incident to his employment. *See, e.g. Shiddell v. Electro Rust–Proofing Corp., supra,* 34 N.J.Super. at 289, 112 A.2d 290; *Shebar, supra,* 111 N.J. at 288–290, 544 A.2d 377. Additionally, in order to be enforceable, the terms of such a contract must be sufficiently clear and capable

of judicial interpretation. *Shebar, supra,* 111 N.J. at 290, 544 A.2d 377. Given these well established legal principles, the initial question for the court is whether the alleged agreement was "clearly, specifically and definitely expressed." *Savarese v. Pyrene Manufacturing Co.,* 9 N.J. 595, 600–601, 89 A.2d 237 (1952); *Shiddell, supra,* 34 N.J.Super. at 289, 112 A.2d 290. The second question is whether it was supported by "consideration additional to the services incident to the employment...." *Ibid.* For the reasons outlined below, both questions must be answered in the negative.

■ Fregara asserts that the terms of the agreement were well defined. His own deposition testimony, however, belies that notion. In support of his allegation, Fregara offers only his "impression" that such a contract existed. (See plaintiff's deposition I at p. 23). Indeed, at his deposition, Fregara could not identify any specific oral promises of job security or lifetime employment that he allegedly received from the defendant. In fact, plaintiff testified that his "oral contract" had no specific terms. (See plaintiff's deposition I at p. 18).

Fregara explained the basis for his allegation that he was employed pursuant to an oral contract as follows:

A. I got the impression when I was hired as long as I performed my job satisfactorily, I was there for—you know. They told me as far as promotions, as far as moving up the ladder because it was a small company at the time and I was limited; and I told them I was satisfied being a coordinator, and I liked working with aircraft, and I wasn't looking for—

Q. You said something about your impression. What was your impression?

A. They told me that as long as I performed my job, that I have a job there.... That was the gist of the conversation at the time.

Q. Do you remember the conversation?

A. Well, not verbatim, no.

(See plaintiff's deposition I at p. 23).[5]

Fregara further described this alleged oral contract in his deposition testimony:

Q. I am looking to understand from you the terms of the contract that you claim existed?

A. This is an oral contract so as such there couldn't be any specific terms.

Q. What was said by any of these individuals at the time you were hired that gives you the impression that this oral contract existed?

A. Well, I said before what John Crawford mentioned.

Q. What did he say?

A. He wished me luck in my career at EAF.

(See plaintiff's deposition II at pp. 18–19).

Fregara's deposition testimony clearly demonstrates that the alleged oral agreement lacks the degree of clarity and specificity requisite for enforcement. The rights accepted and the obligations imposed were never clearly and unequivocally expressed in the contract. The language which Fregara relies upon in support of his assertion that an oral contract existed is not even strong enough to suggest that an offer or promise of employment was ever made, much less that the terms were "clearly, specifically and definitely expressed." *Savarese v. Pyrene Manufacturing Co., supra,* 9 N.J. at 600–601, 89 A.2d 237.[6] No specific promise of life-time employment or job security was ever made to Fregara. Moreover, Fregara cannot point to any language which addresses the specific terms of the alleged oral contract (*i.e.,* wages, hours, job responsibilities, definition of "just cause for termination", etc.).

The only possible foundation for a contract was Fregara's testimony that John Crawford (the Vice President of Maintenance) "wished me luck in my career at EAF ... [and] [t]hey told me that as long as I performed my job, that I have a job there...." These words, however, do not comport with the precision and clarity required by the law. The former statement is more in the nature of a friendly expression to someone beginning a new job, while the latter is nothing more than a colloquial expression of confidence in a new employee. These words can in no way be translated into a promise of employment.

Fregara's "impression" that he had an oral contract providing for job security, completely unsupported by the record, does not provide a basis for avoiding summary judgment. As the court noted in *Carney v. Dexter Shoe Co.,* 701 F.Supp. 1093, 1103 (D.N.J.1988):

A long-term employment commitment is only enforceable if there is proof of a *precise agreement* and a long-term commitment is supported by consideration from the employee in addition to the employee's continued work.

*Id.* (emphasis supplied).

Fregara's deposition testimony demonstrates not only the absence of a precise agreement, but also the absence of consideration to support such an agreement. Specifically, Fregara testified at his deposition:

Q. Did you at any time negotiate for a contract?

A. No, no.

---

**5.** Fregara also testified that he got this same "impression" from the position description for maintenance coordinator:

Q. What is it in the job description that gives you the impression you could only be terminated for cause?

A. Well, to me I get the message, if I can do this job and do all these things, I will be kept on if I on [sic] do it in a satisfactory manner. (See plaintiff's deposition I at p. 35).

**6.** In *Savarese,* the plaintiff could not demonstrate the requisite elements of an enforceable life-time contract. The only possible basis for a contract was the vice president's statement that

"you will have a foreman's job for the rest of your life." These words, according to the Supreme Court of New Jersey, were "vague and uncertain" and did not "comply with the precision and clarity required by the law." *Savarese,* 9 N.J. at 603, 89 A.2d 237. The supreme court found that these words "... partake more of the nature of a 'friendly assurance of employment'...." *Id.* This court notes that the language relied upon by Fregara is even less compelling and precise than the words which the *Savarese* court found were insufficient to support an oral contract of employment between the parties.

Q. Did you offer or give EAF consideration beyond coming to work and performing your duties to the best of your ability?

\* \* \* \* \* \*

A. No, other than performing my duties, what I was hired to do.

(See plaintiff's deposition II at pp. 17–18).

Even *assuming arguendo* that Fregara could establish that there was an oral offer of job security with precise terms, his alleged oral contract must fail for lack of consideration. *See Woolley v. Hoffman La Roche, Inc.,* 99 N.J. 284, 293, 301 n. 8, 491 A.2d 1257 (1985), *modified,* 101 N.J. 10, 499 A.2d 515 (1985); *Shebar, supra,* 111 N.J. at 287–88, 544 A.2d 377; *Shidell v. Electro Rust–Proofing Corp.,* 34 N.J.Super. 278, 289, 112 A.2d 290 (App.Div.1954) (to create enforceable employment contract, employee must give "consideration additional to the services incident to his employment"). At oral argument, on February 25, 1991, plaintiff asserted that he agreed to give up his right to be promoted or the prospect for promotion as additional consideration in return for the oral promise of job security. When questioned at his deposition about this additional consideration, Fregara replied:

A. At that time when they offered the job to me after going back for the second time, John Crawford said before the interview, you know, the probability of you getting promoted to a hirer [position] is not very good because of the fact of your age and also the fact that there's quite a few people here … not that many positions available on top and the people that have been here longer than you naturally get in those positions. So I recognized that fact and said I would be happen to be a coordinator and on that basis I was offered the job. I was wished luck by John Crawford who was Vice President of Maintenance in the job and hoped everything would go well in my career.

■ The essential requirement of consideration is a bargained for exchange of promises or performance that may consist of an act, or forbearance, or the creation, modification, or destruction of a legal rela-

tion. *See Restatement (2d) of Contracts,* § 71 (1981). Fregara's deposition testimony demonstrates that there was no bargained for exchange of promises or performance but rather, that these were the terms and conditions of employment (*i.e.,* a job offer with little or no opportunity for advancement). Fregara suffered no detriment because he had no right to be promoted. Moreover, the defendant employer received no benefit as it had no obligation to promote an employee.

In support of his argument that foregoing his right to be promoted constituted additional consideration, Fregara relies heavily on *Greene v. Oliver Realty Co.,* 363 Pa.Super. 534, 526 A.2d 1192 (1987). In *Greene,* the Pennsylvania Superior Court upheld an employer's promise of lifetime employment in exchange for an employee's agreement to work at a rate below the union scale. The *Greene* case is distinguishable from the facts of this case for two reasons. First, in *Greene,* there was a specific promise of life-time employment. In this case, Fregara has failed to establish an essential element of an oral contract for employment, namely, a specific promise or offer of job security. Secondly, in *Greene,* the employee had an independent right to receive union wages as soon as he began his employment. The employer in *Greene* was not free to impose wages below the union standard as a condition of employment without an employee's consent. When the employee accepted a job for life in exchange for his agreement to work below union wages, he accepted terms and conditions of employment which deviated from those guaranteed him by a contract between his employer and the union. Clearly, the employer in *Greene* received a benefit since it would be obligated to pay the employee the higher union wages absent his agreement to forego that legal right.

In this case, the limited opportunity for advancement was part and parcel of the job offer. In contrast to the employer in *Greene,* defendant EAF had the unfettered discretion to offer plaintiff a job with little or no opportunity for advancement since

plaintiff possessed no independent right to be promoted nor, for that matter, to be considered for promotion. In short, under Fregara's theory of consideration, the defendant would have received no benefit and Fregara would have suffered no detriment given the terms of the alleged oral contract.

Finally, plaintiff argues that he accepted a position whereby he gave up all opportunity to advance and that he is entitled to rely on the representations of an employer under the doctrine of promissory estoppel. As such, Fregara maintains that the alleged oral promise of job security must be enforced. The definition of promissory estoppel is set forth in *Restatement (2d) of Contracts*, § 90(1) (1977):

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee and which does induce such action or forbearance is binding, if injustice can be avoided only by enforcement of the promise.

A key element in the theory of promissory estoppel is that the promisee must suffer some detriment in reliance on the promise. In this case, Fregara cannot establish that he suffered any detriment. Fregara was unemployed at the time he accepted his position with the defendant. Fregara did not forego any other job offers as there were none. Quite simply, all that Fregara gave up was his right to be unemployed. As such, Fregara cannot establish the existence of an enforceable oral contract of employment. Accordingly, summary judgment is GRANTED in favor of the defendants on the first and third counts of plaintiff's complaint.

## BREACH OF IMPLIED CONTRACT IN EMPLOYEE HANDBOOK

Plaintiff contends that the employee handbook, published and distributed by the defendant, formed the basis of a contract which provided the plaintiff with job security. Defendant maintains that the handbook did not contain any enforceable promises of job security. It is well established that, in the absence of a clear and prominent disclaimer, an implied promise in an employee handbook that an employee will be terminated only for cause may be enforceable against an employer when the employment would otherwise be terminable at will. *Woolley v. Hoffman La Roche, Inc.,* 99 N.J. 284, 285, 491 A.2d 1257, *modified,* 101 N.J. 10, 499 A.2d 515 (1985). In *Woolley,* the Hoffman La Roche manual was held to provide a contractually enforceable promise of job security because of its stated policy "to retain ... the services of all employees who perform their duties efficiently and effectively", 99 N.J. at 310, 491 A.2d 1257, and to discharge them only for specific, enumerated offenses. *Woolley,* 99 N.J. at 287, 297, 300, 491 A.2d 1257. It was that policy, so expressly stated, that "provide[d] for job security." *Woolley,* 99 N.J. at 297, 491 A.2d 1257.

Plaintiff points to the following provisions of the EAF handbook in support of his assertion that there was an implied promise to discharge employees only for cause:

*DOES MY EMPLOYMENT REQUIRE A PROBATIONARY PERIOD?*

You are considered to be in a probationary or orientation period for your first twelve months of employment or of assignment to any new position. During this time, you will become acquainted with the company and your job responsibilities under the guidance of your department head and fellow employees. At the end of this period, your performance will be reviewed by your department head and a determination will be made concerning your continued employment *as a regular employee.* During the probationary period, you are subject to termination without recourse to the grievance procedures afforded herein to *regular employees.* (Emphasis supplied).

*FOR WHAT REASONS MAY MY EMPLOYMENT BE TERMINATED?*

\* \* \* \* \* \*

(3) DISCHARGE.

To be discharged for any reason is obviously a serious matter. Therefore, the

company, through its department heads and human resources manager attempts to forewarn you about any deficiencies in job performance or observance of company requirements. Your department head will also try to help you correct your problem. However, if all attempts fail, *the only recourse may be to recommend discharge.* Please carefully read the company's grievance procedures including its list of conduct subject to discipline and/or discharge. (Emphasis supplied).

*WHAT IS A DISCHARGEABLE OFFENSE?*

The following offenses *are examples* of events which could result in immediate discharge. (Emphasis in original). However, it should be recognized that this is a partial list of offenses. (1) Safety related failures which could have endangered persons or property; (2) Theft of goods or services; (3) Conviction of a crime; (4) Written or oral falsification of information required by the company; (5) Use of illegal drugs....

■ Plaintiff contends that the mere existence of a "probationary" category is inconsistent with the concept of "at-will employment." The implication is that once the probationary period is over, the company can no longer fire for any reason or no reason at all. The rationale behind this assertion is that if the company expressly reserves the right to fire for any reason during the probationary period, then the employee who survives has earned the protection of a "just cause requirement" for termination. The court finds that reasonable men could differ as to the meaning of this language in the employee handbook and whether it could be relied upon as an enforceable contract providing for job security. However, I need not resolve that question since, even assuming that the handbook constituted a contract of employment, plaintiff's contract claims must be dismissed because he did not invoke and exhaust the handbook's grievance and arbitration procedure.

The EAF handbook relied upon by Fregara contained an elaborate and detailed employee grievance procedure which provided, in pertinent part, as follows:

**EMPLOYEE RESPONSIBILITY**

Any employee who desires to file a grievance concerning an action of the company affecting him or her, *shall have such grievance considered in accordance with the following procedures, provided any written appeal by the employee is received by the appropriate company representative within the time limits specified herein.*

(See page 957 of Grievance Procedure attached hereto as Appendix A).

The procedure relating to matters of discipline and discharge is set forth at page 958 of the Grievance Procedure. An aggrieved employee has three (3) business days to appeal the discharge action to the department head or his supervisor. (See page 959, par. 2 of Grievance Procedure). An employee is then entitled to a further appeal (which must be taken within three (3) days) to the company's Board of Adjustment. (See page 960, par. 5 of Grievance Procedure). The Board of Adjustment is composed of four members, two of whom are selected by non-supervisory company personnel, and two of whom are appointed by the President of the company. (See page 961, par. D.2 of Grievance Procedure). In the event of a deadlock, an *impartial referee* is selected to serve as a tie breaker and Chairman of the Board. (See page 963, par. B of the Grievance Procedure). The decision of the five member Board is *final and binding.* (See page 963, par. 6C of the Grievance Procedure).

Although defendant gave plaintiff a letter of termination, plaintiff never made an effort to invoke the grievance procedure. Plaintiff's deposition testimony reveals that, although he was aware of the employee grievance procedure, he simply chose not to invoke it:

Q. To your knowledge, was there any kind of employee grievance procedure available to you?

A. There was a procedure, yes.

Q. Did you attempt to invoke it?

A. At that time [when he was terminated]?

Q. Yes.

A. I felt things had gone too far to start an employee grievance procedure.
Q. So you didn't attempt to invoke the employee grievance procedure if there was one in effect?
A. that's true....

(See plaintiff's deposition I at p. 133).

 While courts in other jurisdictions have consistently held that breach of contract claims based upon employee handbooks are barred when an employee fails to exhaust the handbook's grievance procedure,[7] there are no New Jersey cases addressing this issue. When applying state law in diversity cases, each federal court functions as a proxy for the entire state court system, and therefore, must apply the law that it conscientiously believes would have been applied in the state court system, which includes the state appellate tribunals. *See Clark, State Law in the Federal Courts:* The Brooding Omnipresence of *Erie v. Tompkins,* 1946, 55 Yale L.J. 267, 290–95. *See also, 19 Wright, A. Miller & E. Cooper,* Jurisdiction and Related Matters, § 4507 (West 1982). A federal court sitting in diversity must determine issues of state law as it believes the highest court of the state would determine them, not necessarily as they have been decided by other state courts in the past. *See id. See also, Wise v. George C. Rothwell, Inc.,* 496 F.2d 384 (3d Cir.1974).

The doctrine of exhaustion of remedies is well established in New Jersey. *Ward v. Keenan,* 3 N.J. 298, 70 A.2d 77 (1949). The rule has been applied to members of labor unions or other voluntary organizations seeking reinstatement or damages from the organization, where there has been no showing that resort to the internal remedies provided for in the constitution or by-laws of the organization would be futile, illusory, or vain. *Jorgensen v. Pennsylvania R.R. Co.,* 25 N.J. 541, 556, 138 A.2d 24 (1958) (citations omitted). The rule of exhaustion has also been applied to suits arising under the School Laws. *See Redcay v. State Board of Education,* 128 N.J.L. 281, 285, 25 A.2d 632 (Sup.Ct.1942). It has been applied to cases arising under the Civil Service Act where employees claimed to have been illegally discharged. *Jorgensen, supra,* 25 N.J. at 557, 138 A.2d 24. (Citations omitted). The rule has also been applied to administrative bodies under the Zoning Laws. *Id.* at 557, 138 A.2d 24. (Citations omitted).

 As previously noted, in situations involving collective bargaining agreements, it has long been the rule in New Jersey that the aggrieved employee must exhaust the remedies provided by the agreement before resorting to the court for redress. *See Jorgensen v. Pennsylvania R.R. Co.,* 25 N.J. 541, 138 A.2d 24 (1958); *Thompson v. Joseph Cory Warehouses, Inc.,* 215 N.J. Super. 217, 521 A.2d 881 (App.Div.1987). This principle is no less applicable here where the rights asserted by plaintiff are contained in an employee handbook. The handbook and company policy provided for avenues of appeal which Fregara was required to pursue before resorting to this court for redress.

The sole basis for the plaintiff's cause of action is the employee handbook itself. Without this handbook, the plaintiff would have no recourse in the event he was discharged with or without cause. If the plaintiff seeks to rely on provisions in the employee handbook as the source of an implied contract of employment, then he must accept that agreement as a whole with its attendant responsibilities. Plaintiff cannot seek to enforce his rights under the agreement while avoiding his responsibilities. In short, plaintiff must accept his obligations along with his rights as in any agreement.

The court is aware that the doctrine of exhaustion of remedies is not an absolute rule and is subject to several exceptions in New Jersey. *See Jorgensen, supra,* 25 N.J. at 558, 138 A.2d 24. By way of example, the doctrine has not been applied where the resolution of the matter depends

7. *See e.g., Schnelting v. Coors Distributing Co.,* 2 I.E.R. Cases (B.N.A.) 1451, 729 S.W.2d 212 (Mo. Ct.App.1987); *Dahlman v. Oakland University,* 3 I.E.R. Cases (B.N.A.) 1765, 172 Mich.App. 502, 432 N.W.2d 304 (1988); *Plummer v. Humana of Kansas, Inc.,* 715 F.Supp. 302 (D.Kan.1988). *See also Suburban Hospital, Inc. v. Dwiggins,* 5 I.E.R. Cases (B.N.A.) 693, 83 Md.App. 97, 573 A.2d 835 (1990), *cert. granted,* 321 Md. 46, 580 A.2d 1066 (1990).

solely on the decision of a question of law, *Nolan v. Fitzpatrick,* 9 N.J. 477, 89 A.2d 13 (1952); or where the jurisdiction of the administrative tribunal is doubtful, or where the charges asserted are so palpably defective as to make the jurisdiction of the tribunal merely colorable, *Ward v. Keehan,* 3 N.J. 298, 70 A.2d 77 (1949); or where the administrative remedies are futile, illusory or vain. *Naylor v. Harkins,* 11 N.J. 435, 94 A.2d 825 (1953). However, the plaintiff in this case does not assert the existence of any facts which would warrant a departure from the general rule under the exceptions noted above.

Specifically, plaintiff presents two arguments in response to his failure to invoke and exhaust the handbook's grievance procedure. First, plaintiff contends that resort to the grievance procedure would have been futile. Secondly, plaintiff maintains that use of the grievance and arbitration procedure was permissive and not mandatory. I must reject plaintiff's futility argument outright. The grievance procedure provided an extremely fair and specific methodology by which an employee could have his rights vindicated. The grievance procedures governing discipline and discharge provides, in pertinent part, as follows:

> [An employee] shall be given at least five business days, after the receipt of written notification of charges, to secure the presence of witnesses and gather evidence and shall have the right to be represented by counsel or an employee of the company. A review, at which the plaintiff and any witnesses and/or representative shall be present, shall be held by the immediate supervisor or manager or designee within five business days after the issuance of the letter of charge to determine what action, if any, should be taken on the charge or charges.

If an employee was dissatisfied with the decision rendered by the immediate supervisor or manager, then he had an absolute right to make a written appeal to the department head. (See Grievance Procedure, § B, par. 2). If the department head was the employee's immediate supervisor, then the appeal would be directed to the department head's supervisor. Moreover, if an employee was also dissatisfied with the decision of the reviewing supervisor, the procedures provided for a further appeal to the EAF Company Board of Adjustment. The Company Board of Adjustment consisted of four members, two of whom were selected by non-supervisory company personnel, elected annually by an employee vote, and two of whom were selected and appointed by the president of the company. In the event of a deadlock by the Board of Adjustment, an employee was entitled to the selection of an impartial referee. Clearly, there is nothing futile or illusory about this process at all. To the contrary, the grievance procedures governing discipline and discharge are extremely fair and impartial, and provide for a series of appeals during which an employee or his counsel may present evidence to the reviewing body. Plaintiff had a responsibility to utilize these internal procedures. He was not free to by-pass these remedies based upon his unfounded belief that resort to such remedies would be futile.

The court now turns to plaintiff's argument that the grievance procedure was permissive and not mandatory. In support of his position that the grievance procedure was permissive, plaintiff refers the court to a section of the employee handbook which briefly describes the grievance procedure as follows:

**THE GRIEVANCE PROCEDURE**

> ... The grievance procedure is a way of helping you and your department had work together in solving work-related problems. Your department head wants you to understand the grievance procedure and to feel free to use it if a problem is not settled to your satisfaction. Remember, from the Chief Executive Officer throughout the Company, we are interested in seeing that you are treated fairly and with respect.

Plaintiff places great emphasis on the phrase "feel free to use it" in asserting that the grievance procedures were permissive. However, this language cannot be read in a vacuum. This paragraph, read as

a whole, is more in the nature of an assurance to any employee that he or she is free to utilize the grievance procedure to solve any work-related problems, including non-disciplinary problems, without the fear of reprisal or retaliation. In short, it is intended to encourage employees to resolve any and all work-related problems through internal grievance procedures. Moreover, a thorough review and analysis of the employee grievance procedure, a document separate and apart from the employee handbook which references it, reveals that the specific grievance procedures governing discipline and discharge are outlined more in the nature of mandatory language. (See employee grievance procedure, § B: Discipline and Discharge, attached hereto as Appendix A). Page 1 of the employee grievance manual notifies the employee that "[t]he supervisor may not ... issue a letter of reprimand to the employee without following the grievance procedures." The first page of the grievance manual also informs an employee that he or she has certain obligations under the agreement which are as follows:

**EMPLOYEE RESPONSIBILITY**

Any employee who desires to file a grievance concerning an action of the company affecting him or her, *shall have such grievance considered in accordance with the following procedures,* provided any written appeal by the employee is received by the appropriate company representative within the time limits specified herein.

The section governing discipline and discharge procedures, which is outlined in detail on page 3 of the grievance manual, specifically describes the responsibilities and the steps to be followed by both the reviewing body and the aggrieved employee throughout the entire internal appeal procedure. Clearly, when the employee grievance manual is read as a whole, it becomes obvious that this elaborate, internal appeal procedure is mandatory and not permissive. This result is logically consistent with the theory underlying the decision in *Woolley. Woolley* stands for the proposition that a binding contract can be implied from provisions contained in an employee handbook. This contract, if implied, is binding as a whole. Plaintiff relies on sections of the employee handbook to the extent that they benefit his cause of action. To the extent that the grievance procedures outlined in the alleged *Woolley* contract are detrimental to his cause of action, plaintiff cavalierly dismisses them as permissive and non-binding. Plaintiff can not selectively determine which aspects of the contract are binding. If the provisions governing job security are binding, then so too is the language concerning utilization of the grievance procedures. Since plaintiff failed to invoke, much less exhaust, the final and binding grievance procedure established in the handbook which he claims was binding upon the parties, defendants' motion for summary judgment on plaintiff's second and fourth claims for breach of contract is GRANTED.

## BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

The New Jersey Supreme Court has held that there is an implied covenant of good faith and fair dealing in every contract. *Onderdonk v. Presbyterian Homes of N.J.,* 85 N.J. 171, 182, 425 A.2d 1057 (1981); *Bak–A–Lum v. Alcoa Building Products,* 69 N.J. 123, 129–130, 351 A.2d 349 (1976); *Association Group Life, Inc. v. Catholic War Veterans of U.S.,* 61 N.J. 150, 293 A.2d 382 (1972); *Palisades Properties, Inc. v. Brunetti,* 44 N.J. 117, 130, 207 A.2d 522 (1965). As a corollary to that proposition, the Supreme Court of New Jersey commented that it is reasonable to imply that neither party to a contract shall injure the right of the other to receive the fruits of the agreement. *Onderdonk, supra,* 85 N.J. at 182, 425 A.2d 1057 (citations omitted). A cause of action for breach of an implied covenant of good faith and fair dealing is also cognizable in an employment context where the employer attempts to deprive the employee of the benefit of the employment agreement without an honest belief that good cause for discharge in fact exists. *See Noye v. Hoffman La Roche, Inc.,* 238 N.J.Super. 430, 570 A.2d 12 (App.Div.1990), *cert. denied,*

122 N.J. 146, 584 A.2d 218 (1990); *see also, Nolan v. Control Data Corp.*, 243 N.J.Super. 420, 579 A.2d 1252 (App.Div.1990).

■ In the absence of a contract, there is no implied covenant of good faith and fair dealing. *See Noye, supra*, 238 N.J.Super. at 433, 570 A.2d 12. However, an implied obligation of good faith is applicable to those aspects of the employer/employee relationship which are governed by some contractual terms, regardless whether that relationship is characterized generally as being "at will". *Nolan v. Control Data Corp.*, 243 N.J.Super. at 429, 579 A.2d 1252. The employment agreement upon which Fregara now bases his claim for breach of an implied covenant of good faith and fair dealing is the purported *Woolley* contract evidenced by the EAF employee handbook.

■ Defendant contends that plaintiff committed various offenses (*e.g.*, signing off on items without having the repair done, letting planes go out without being inspected, violating FAA regulations, etc.), which, as a matter of law, formed the basis for an honest belief that good cause for discharge existed. Plaintiff maintains that he did not once compromise the company's position in the performance of his duties and that he always exercised his sound judgment aided by 33 years of experience. Moreover, plaintiff argues that he followed the same procedures of "signing off on items" and "inspecting planes before take offs" in previous years and he was always evaluated as "excellent". Plaintiff's contentions in this regard are part and parcel of his breach of contract claim. These are all arguments concerning the issue of just cause for termination which plaintiff had both an absolute right and an obligation to advance and exhaust through the internal review procedures.

■ Plaintiff also asserts that defendant breached the covenant of good faith and fair dealing by failing to follow its own evaluation procedures prior to disciplinary discharge. Specifically, plaintiff alleges

that, during the last four years of his employment, defendant failed to provide him with performance evaluations in a timely manner. Thus, plaintiff argues that defendant breached its promise contained in the employee handbook to forewarn him about any deficiencies in job performance before resorting to discharge. In addition, plaintiff alleges that defendant acted in bad faith and in violation of the company handbook when it failed to provide copies of documents to him which were utilized in the decision to terminate him. Plaintiff emphasizes the fact that his last evaluation, due November 1988, was dated January 1989, and was not given to plaintiff until May of 1989. Although Kunert testified that the reason for the delay in completing plaintiff's evaluation was that he wanted to be sure of the evaluation, the final product was a word for word copy of a memorandum to plaintiff some 15 months prior.

■ Plaintiff's claim that defendant breached its covenant of good faith and fair dealing is not a tort claim, but rather is contractual in nature. *See Noye v. Hoffman La Roche, Inc., supra*, 238 N.J.Super. at 437, 570 A.2d 12. (The Appellate Division held that tort damages are not recoverable for breach of the covenant of good faith and fair dealing and that plaintiff's remedies are contractual in nature.). *Assuming arguendo* that a contract existed, and assuming plaintiff could adduce facts which might establish his claim of a violation of the implied covenant of good faith and fair dealing, he is barred from pursuing his claim in this forum based upon his failure to invoke and exhaust the dispute resolution procedures set forth in the employee handbook and grievance manual. Plaintiff's claims, if proven, could have been fully redressed through the grievance procedures. Accordingly, defendants' motion for summary judgment to dismiss plaintiff's fifth claim for breach of the duty of good faith and fair dealing is GRANTED.[8]

8. Although absent from his pleadings, in his brief, plaintiff asserts that he has a cause of action for "negligent evaluation". This action has not been recognized in New Jersey, and has

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIP/CONSPIRACY TO WRONGFULLY TERMINATE EMPLOYMENT

Plaintiff's sixth count, fairly read, alleges a cause of action for tortious interference with economic benefit. Plaintiff may not pursue this action since he has failed to establish interference by third parties to the relationship. In addition, Fregara cannot establish the requisite element of malice.

 New Jersey law clearly establishes that an action for tortious interference cannot be maintained "where the claim is by one party against the other party to the contract and not against a third party interloper who has interfered with the contractual relationship." *Sandler v. Lawn-A-Mat Chemical & Equipment Corp.*, 141 N.J.Super. 437, 450, 358 A.2d 805 (App.Div. 1976), *cert. denied*, 71 N.J. 503, 366 A.2d 658 (1976), *see also, Cappiello v. Ragen Precision Industries, Inc.*, 192 N.J.Super. 523, 529, 471 A.2d 432 (App.Div.1984) (employer cannot interfere with its own employment contract). As Dean Prosser aptly stated, "the defendant's breach of his own contract with the plaintiff is of course not a basis for the tort (of malicious interference with contractual relations)." *Prosser, Law of Torts*, § 129, at 990 (5th Ed.1985).

 In this case, plaintiff cannot maintain an action for tortious interference against his own employer, Jet Aviation. Jet cannot interfere with its own employment relationship with plaintiff. Similarly, plaintiff's supervisors, Kunert and Baillif, the individual defendants, were not interlopers or third parties to Jet's employment relationship with plaintiff. In *Meyer v. Bell & Howell Co.*, 453 F.Supp. 801, 802 (E.D.Mo.1978), *appeal dismissed*, 584 F.2d 291 (8th Cir.1978), the court dismissed an action against two supervisory employees for tortious interference with an employment contract. In dismissing plaintiff's action, the *Meyer* court stated:

[a] party to a contract cannot be liable for conspiracy to induce its breach. Although the corporation is the real party in interest to the contract, the corporation can act only through its agents. As employees who have the authority to hire or fire plaintiff, Cohen and Hauser would reasonably be considered parties to the contract. (Citing, *Lyon Ford, Inc. v. Ford Marketing Corp.*, 337 F.Supp. 691, 694 (E.D.N.Y.1971)).

The alleged tortious activities of Kunert and Baillif were undertaken in their capacity as supervisors and agents of Jet. Where, as here, the employer ratified and participated in the conduct complained of, there exists no question but that the employer acted through its agents. Thus, as agents of Jet, Kunert and Baillif cannot be viewed as third parties or interlopers and could not have committed the tort of malicious interference with economic benefit. Plaintiff cannot maintain an action against any of the defendants for interference with his economic relationship with Jet.

 Moreover, plaintiff cannot avoid summary judgment by advancing this claim in his brief as one for "conspiracy". Plaintiff has failed to demonstrate that the courts of New Jersey have recognized or would recognize a cause of action for "conspiracy to wrongfully discharge". On the contrary, the case law establishes that New Jersey courts would not expand upon the law to create a new cause of action in tort. *See Noye v. Hoffman La Roche, Inc.*, 238 N.J.Super. at 438, 570 A.2d 12 (the appellate division rejected a cause of action for "negligent supervision").

The core of a conspiracy action is not the conspiracy charged, but the tort working

been rejected by most courts that have considered it. *See e.g., Mann v. J.E. Baker Co.*, 733 F.Supp. 885, 887 (M.D.Pa.1990); *Dahlman v. Oakland University*, 3 I.E.R. Cases (Bna.) 1765, 1767, 172 Mich.App. 502, 432 N.W.2d 304 (1988), *leave to appeal denied*, 431 Mich. 910 (1988). Indeed, the *Dahlman* case appears to overrule the earlier decision in *Schipani v. Ford*

*Motor Co.*, 102 Mich.App. 606, 302 N.W.2d 307 (1981), relied upon in plaintiff's brief. In any event, plaintiff cannot pursue any cause of action based upon negligence due to the exclusive remedy provision set forth in the New Jersey Workers' Compensation Act, N.J.S.A. 34:15–8. *Cremen v. Harrah's Marina Hotel Casino*, 680 F.Supp. 150, 155–56 (D.N.J.1988).

damage to the plaintiff. *Prosser, Law of Torts,* § 47 at 324 (5th Ed.1985). There must be some act committed by one of the parties in pursuance of the agreement which is itself a tort. *Id.* In this case, plaintiff's "claim of conspiracy" is based on the underlying acts of his supervisors in allegedly provided untimely and inaccurate evaluations. Since New Jersey law does not recognize a cause of action for negligent evaluation and has already rejected a cause of action for negligent supervision, *see Noye, supra,* plaintiff's claim of conspiracy must fall. Accordingly, defendants' motion for summary judgment on plaintiff's sixth count is hereby GRANTED.

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

■ In his seventh count, Fregara alleges that Jet and the individual defendants maliciously and intentionally inflicted emotional distress upon him. New Jersey courts have adopted the definition of the *Restatement (2d) of Torts,* § 46 (1965) for the intentional infliction of emotional distress. *Buckley v. Trenton Savings Fund Soc.,* 111 N.J. 355, 544 A.2d 857 (1988); *Hume v. Bayer,* 178 N.J.Super. 310, 428 A.2d 966 (Law Div.1981). Under this definition, the plaintiff must prove conduct by the defendant "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.* 111 N.J. at 366, 544 A.2d 857 (*quoting, Restatement (2d) of Torts,* § 46, comment d). The act must have been done with the intent to do the act and to produce the emotional distress, or in deliberate disregard of a high degree of probability that emotional distress will follow. *Id.* The defendant's actions must have been the cause of the emotional distress, and the distress must be "so severe that no reasonable man could be expected to endure it." *Id.* (*Quoting Restatement (2d) of Torts,* § 46, comment j); *Hume,* 178 N.J.Super. at 317–319, 428 A.2d 966.

The difficulty of establishing such a claim in an employment related dispute has been recognized by the courts. Thus, in *Cautilli v. G.A.F. Corp.,* 531 F.Supp. 71 (E.D.Pa.1982), the court (applying New Jersey law) granted summary judgment dismissing plaintiff's cause of action for intentional infliction of emotional distress and stated:

> We do not believe that [New Jersey] courts would extend this tort to cover an employment contract dispute such as that before us. To the contrary, application of this tort must be restricted to instances of extreme and outrageous conduct; indeed, the limited scope of the tort tolerates many kinds of unjust, unfair and unkind conduct.

*Id.* at 74. *See Brunner v. Abex Corp.,* 661 F.Supp. 1351 (D.N.J.1986); *see also, Cox v. Keystone Carbon Co.,* 861 F.2d 390, 395 (3d Cir.1988) ("... it must be recognized that it is extremely rare to find conduct in the employment context which will rise to the level of outrageousness necessary to provide a basis for recovery....").

■ Plaintiff has failed to produce any evidence of "extreme and outrageous" conduct directed at him by the defendants. At his deposition, plaintiff admitted that the following alleged conduct on behalf of Kunert and Baillif was the only evidence he had in support of his claim of intentional infliction of emotional distress:

1. Plaintiff was told that if he fouled up, he would be out the door;

2. Plaintiff was asked to resign;

3. Plaintiff was overworked;

4. Plaintiff was required to attend counselling sessions dealing with his performance;

5. Plaintiff was told he wasn't doing a good job;

6. Plaintiff was given warning notices; and

7. Plaintiff's performance was closely monitored.

(Plaintiff's deposition I at pp. 138–142).

Assuming plaintiff's allegations are true, as I must, actions of the type which he alleges fall far short of "conduct exceeding

all bounds usually tolerated by decent society," the standard established in *Hume*. *Hume*, 178 N.J.Super. at 315, 428 A.2d 966.

Furthermore, it is fatal to plaintiff's cause of action that he cannot establish that he suffered severe emotional distress. The following deposition testimony illustrates this flaw:

A. After I was let go I wasn't feeling too well for a while.

Q. How [did] that manifest itself?

A. I was very anxious about what I was going to do for a living.

Q. You didn't seek professional help then?

A. No....

(Plaintiff's deposition I, at p. 7).

■ Proof of the suffering of severe emotional distress is a necessary element to plaintiff's cause of action. *See Hume*, *supra*, 178 N.J.Super. at 319, 428 A.2d 966. *See also, Weber v. L.D.C./Milton Roy*, 1 I.E.R. Cases (B.N.A. 1509, 1520 (D.N.Y. 1980) ("[plaintiff] was not examined by a physician or psychiatrist to treat his alleged condition, and there is simply no evidence supporting his claim.")) Since there is simply no evidence to support a finding that plaintiff suffered severe emotional distress, defendants' motion for summary judgment on plaintiff's claim for infliction of emotional distress is hereby GRANTED.

## CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment is GRANTED on all seven counts of plaintiff's complaint.

SO ORDERED.

## APPENDIX A

EMPLOYEE GRIEVANCE PROCEDURE

POLICIES:

In any sizeable organization, friction or misunderstanding may arise because of the wide variety of circumstances under which employees work. It is, therefore, to the advantage of both the employee and the Company that a method of presenting problems be provided so that corrections and adjustments can be made where appropriate. In this light, the employee grievance procedure has been established as outlined below to provide a method for correcting the misapplication of Company policies and/or procedures. The grievance procedure does allow for you to influence Company policies by obtaining clarification of policies and procedures. The Grievance Procedure is not intended, nor can it be used, as a procedure for seeking revisions to Company policies or procedures.

Please note that any employee who elects to use the grievance procedure will not be discriminated against at any time in his or her career because he or she filed a grievance or grievances. It is well to bear in mind that good judgment on the part of persons in authority can never be replaced by a set of rules. The true essentials of proper discipline are fair dealing and mutual trust, with each disciplinary situation dealt with on its own merits.

Personal discussions between a supervisor and an employee do not constitute discipline. The grievance procedure was not intended to, and does not, affect the day-to-day contact between a supervisor and the employees under his supervision. Any supervisor has the right to discuss a matter of Company business with an employee and grievance procedures impose no restrictions on this right. The supervisor may not, however, issue a Letter of Reprimand to the employee without following the grievance procedures. If the supervisor desires to keep a personal notation of his discussion, he may do so, and such notation may be placed in the employee's file, but it may not be considered in a future case as prior "discipline."

*ELIGIBILITY:*

This procedure is available to non-management employees who feel that Company policy has been applied to them improperly.

Employees who have not completed their probationary period may not utilize the grievance procedure in the event of discipline, but may utilize the grievance proce-

dure for other matters affecting their employment.

## EMPLOYEE RESPONSIBILITY:

Any employee who desires to file a grievance concerning an action of the Company affecting him or her, shall have such grievance considered in accordance with the following procedures, provided any written appeal by the employee is received by the appropriate Company representative within the time limits specified herein.

## GRIEVANCES

### SECTION A. NON–DISCIPLINARY GRIEVANCES:

Any employee, including probationary, who has a grievance concerning any action of the Company affecting them, except matters involving discipline, which are covered by Section B, shall have such grievance considered in accordance with the following procedures provided such grievance is filed within thirty (30) days after the employee(s) reasonably would have had knowledge of the facts upon which the grievance is based. This does not preclude claims for adjustment arising out of bookkeeping errors beyond thirty (30) days but less than 12 months from the date of reasonable knowledge of the facts.

1. A written request for a hearing setting forth a detailed statement of the known facts out of which the grievance arose and a request for specific relief shall be filed with his or her supervisor.

2. A review shall be held within not more than ten (10) business days after receipt of such written request by the supervisor or his/her designee and within five (5) business days after the close of the review, the supervisor or designee shall announce her/his decision in writing. All notices of reviews and decisions reached therein shall be in writing to the grievant(s) with copies to the President and Chief Executive Officer and Company Board of Adjustment.

3. If an appeal is desired such appeal shall be made in writing to the Department Head provided such appeal is filed within ten (10) business days after the date the decision was received by the grievant(s). Should the Department Head be the originating reviewer, the next appeal step should be to the Department Head's immediate superior.

4. Such an appeal review shall be held within ten (10) business days after the receipt of the written appeal by the Department Head. Within five (5) business days after the close of such appeal review, the reviewer shall announce her/his decision in writing to the grievant(s) and furnish a copy to the Board of Adjustments and the President and Chief Executive Officer or designee.

5. Further appeal by the grievant(s), if made, shall be to the EAF Company President and Chief Executive Officer provided such appeal is made within five (5) business days from the date of receipt by the grievant(s) of the decision of the Department Head or his/her designee. The President and Chief Executive Officer or his/her designee shall review within ten (10) business days the grievant's claim and afford the grievant and Department Head an opportunity to present their positions. Within five (5) business days of completing the review, the President and Chief Executive Officer shall issue to the grievant(s) and to the Department Head, his/her decision which decision shall be final.

### SECTION B. DISCIPLINE AND DISCHARGE:

1. a. When a supervisor decides that discharge or disciplinary action may be required, the supervisor shall provide to the employee verbal or written notice of the specific charges against the employee.

 b. Within one (1) business day of a giving of verbal notice, as provided for in 1(a) above, such employee shall be notified in writing by the Company of the precise charge or charges against him/her. She/he shall be given at least five (5) business days, after the receipt of written notification of charges, to secure the presence of witnesses and gather evidence and shall have the right to be represented by

counsel or an employee of the Company. A review, at which the employee and any witnesses and/or representative shall be present, shall be held by the immediate supervisor or manager or designee within five (5) business days after the issuance of the letter of charge to determine what action, if any, should be taken on the charge or charges.

c. Within five (5) business days after the close of the review, a decision shall be announced in writing and, if requested by the employee, a copy shall be furnished to the Chief Executive Officer and Board of Adjustment.

d. (i) During the course of any discharge or discipline proceeding in accordance with Section 1a, b, & c, the Company may, at its option, hold the employee out of service.

(ii) The Company may at its discretion grant a request by the employee for an extension of time. Any extension of time limits granted at the request of the employee shall be on a without pay basis for the period of the extension. The employee shall continue to receive full pay and benefits during any extension made at the request of the Company.

2. If the employee is dissatisfied with any discipline or discharge action of the Company and desires to appeal, he/she shall within three (3) business days after receiving such decision make a written appeal to the Department Head; if the Department Head is the employee's immediate supervisor, then to the Department Head's supervisor.

3. The Reviewing Supervisor, in 2 above, or his/her designee shall hear such appeal within five (5) business days after receipt of the employee's written request therefor.

4. Within five (5) business days after hearing such appeal, the Reviewing Supervisor or her/his designee shall issue a decision in writing to the employee and furnish a copy to the President and Chief Executive Officer.

5. Further appeal only by the grievant(s), if made, shall be to the EAF Company Board of Adjustment provided such appeal is made within three (3) business days from the date of receipt by the grievant(s) of the decision of the Reviewing Supervisor or his/her designee.

6. Nothing in Section B shall be construed as extending the rights of the Section B to an employee during his probationary period.

SECTION C. GENERAL:

1. The time limits set forth in Sections A and B may be extended by mutual agreement, in writing, of the Company by the Department Head, President, and the grievant. The absence of grievant or reviewer while on Company assignment shall automatically extend the affected time period by the duration of the absence. A copy of any such extension shall be furnished to the Board of Adjustment Chairperson and the Chief Executive Officer.

2. If any decision of the Company under the provisions of this Sections A and B is not appealed by the grievant(s) within the time limits prescribed herein for such appeal or any extension mutually agreed upon, the decision of the Company shall be final and binding. If any hearing or decision required of the Company under the provisions of this Section is not provided within the time limits herein, or any extension mutually agreed upon, the grievant(s) shall consider the request denied and may appeal it to the next step of the grievance procedure.

Any grievance appealed to the Department Head may not be remanded to the preceding step without the concurrence of the grievant.

3. Nothing in Sections A and B shall be construed to prevent the Company from holding an employee out of the service without pay pending an investigation and review and appeal therefrom.

4. a. If, as a result of any review or appeals therefrom, an employee is exonerated, they shall be made whole for any and all pay and benefits not received during the grievance process.

b. If, as a result of any hearing or appeals therefrom, an employee is exonerated, all personnel records shall indicate clearance of the charges.

5. When it is mutually agreed that a stenographic report is to be taken of a review in whole or in part, the cost will be borne equally by both parties to the dispute. When it is not mutually agreed that a stenographic report of the proceedings be taken and such stenographic record of the hearing is made by either of the parties to the dispute, a copy shall be furnished to the other party to the dispute upon request, provided that the cost of such written record so requested shall be borne equally by both parties to the dispute.

6. All notification in writing shall be accomplished by personal delivery or by depositing such notice in the U.S. Mail, postage prepaid, Certified Mail, addressed to the last known address of the party to whom the notice is being given. Notices to the Company supervisory personnel shall be given to the Company office at which they are assigned.

7. The travel expenses of witnesses and representatives shall be borne by the party requesting their presence.

Also, grievants, witnesses and their representatives who are employees may be granted a leave of absence without pay, subject to the needs of the Company, for the purpose of investigating and gathering evidence associated with the grievance.

8. When an employee is chosen to act as representative of or a witness for another employee, such employee shall be given sufficient time with pay to permit him/her to appear as such representative or witness. The selection of a witness must be reasonably related to the charges made. The number of witnesses called by a grievant must be reasonable and the Company will be obligated only in providing time-off with pay for a maximum of three employee witnesses.

9. If more than one (1) management representative is present (including the Supervisor) at a review or conference with an employee concerning a matter which may result in disciplinary action, such employee will be advised by the Company of his right to have a representative of his choice present, provided such representative will be available within a reasonable period of time not to exceed twenty-four (24) hours. Further, when an employee is requested to appear at a disciplinary review or disciplinary conference, he/she shall be advised of the nature of the subject to be discussed.

10. The Company shall consider any disciplinary action taken against an employee as cleared from the employee's record file after a three (3) year period of active service (five (5) years in the case of discipline relating to aircraft safety) from the date of issuance if no further discipline has been imposed during that period.

11. An employee will be furnished a copy of any information which is placed in his personnel file that may be used in the evaluation of his/her performance and/or employment relationship.

12. An employee or his/her authorized representative shall have access at the Company's offices to all relevant grievance related material at such time as there is an active grievance on file that could result in discipline or discharge. Right of access to Company files is strictly confined to material personally relevant to the grievant and no right of inspection of Company files in general is provided for hereunder.

13. For the purpose of all time limits of the grievance procedures, "business" days shall mean Monday through Fridays except those days which are recognized by the Company as holidays.

14. The employee shall provide a written confirmation to the Company of any selection of a representative prior to that representative exercising any procedural privileges provided for hereunder.

SECTION D. COMPANY BOARD OF ADJUSTMENT

1. In compliance with our grievance procedures, there is hereby established a Company Board of Adjustment, which shall

be known as the "EAF Board of Adjustment" hereinafter referred to as the "Board."

The Board's purpose shall be to adjust and decide disputes which may arise under the terms of the company procedures when such disputes have been properly submitted to the Board.

2. Composition of the Board

a. The Board shall consist of four (4) members, two (2) of whom shall be selected by non-supervisory company personnel, elected annually by an employee vote, and two (2) of whom shall be selected and appointed by the President of the Company. These four individuals shall be known as "Board Members." In addition, the employees and the Company shall respectively elect and designate a first and second alternate, and in the event of the unavailability of a Board Member, the respective first or second alternate, in order of availability, will act as a Board Member in place of the absent Board Member. During the month of May of each year, all non-supervisory personnel interested in participating as members of the Company Board of Adjustments, may submit in writing his/her name to the Chairperson of the Board along with a brief description of their qualifications. By June 16th, a candidate ballot will be transmitted to each non-supervisory employee along with a brief resume written by each candidate. The ballots will provide for a first, second, third, and fourth choice among the candidates. Ballots will be submitted to the Chairperson and Vice Chairperson of the committee to be counted. Candidates receiving the highest numbers of votes will be elected as regular Board members or first or second alternate as the cumulative votes may indicate. Board member terms shall be twelve (12) months from July 1 of each year. No individual may serve two (2) consecutive terms, however, an individual may serve for an unlimited number of non-consecutive terms.

b. The two (2) Board Members appointed by the Company, and the two (2) Board Members elected by company personnel and their alternates shall serve for one (1) year from the date of their appointment or election, and, thereafter, until their successors have been duly appointed or elected. Vacancies shall be filled in the same manner as is provided herein for the election or appointment of the original Board Members and the original alternates.

c. The Board Members shall select a Chairperson and a Vice Chairperson, both of whom shall be members of the Board. The term of office of Chairperson and Vice Chairperson shall be one (1) year. Thereafter, from year to year, the Board shall designate one of its members to act as Chairperson and one to act as Vice Chairperson for one (1) year terms.

d. The office of Chairperson shall be filled and held in alternate twelve month periods by the Board Member elected by Company personnel and by a Board Member appointed by the Company. When a Board Member elected by the employees is Chairperson, a Board Member appointed by the Company shall be Vice Chairperson, and vice versa. Subject to the provisions of Paragraph 6, the aforesaid Chairperson, or, in his absence the Vice Chairperson, shall preside at meetings of the Board and at hearings. Both shall have a vote in connection with all actions taken by the Board.

e. When there are cases filed with the Board for their consideration, the Board shall meet in the city where the general offices of the Company are maintained, (unless a different place of meeting is agreed upon by the Company and the Board).

3. Jurisdiction of the Board

a. The Board shall have jurisdiction only over disputes between any employee and the Company resulting from grievances. The Board shall solely review for correct finding of fact(s) and whether or not company

policies or procedures, the breach of which resulted in discipline, were clearly communicated to the grievant(s). The jurisdiction of the Board shall not extend to proposed changes in hours of employment, rates of compensation or working conditions covered by existing Company Regulations.

b. The Board shall consider any dispute properly submitted by an employee or by the Company when such dispute has not been previously settled in accordance with the terms provided for in Section B.

4. Proceedings Before The Board

a. All disputes properly submitted to the Board for consideration shall be addressed to the Members of the Board, including all papers and exhibits in connection therewith. Each case submitted shall show:

1. Question or questions at issue.

2. Statement of facts.

3. Position of employee or employees.

Copies of all papers and exhibits presented to the Board shall be provided by either the grievant or the Company to all Board Members and the other party, grievant or Company as the case may be. When desired, joint submissions may be made, but either party may submit the dispute and its position to the Board. No matter shall be considered by the Board which has not first been handled in accordance with the provisions of Section B including the rendering of a decision thereon by the Department Head or designee.

b. Upon receipt of notice of the submission of a dispute, the Chairperson shall set a date as early as possible for hearing at such place as the Chairperson and Vice Chairperson shall agree upon, but not more than five (5) days after such request for meeting is made and the Chairman shall give the necessary notices in writing of such meeting to the Board Members and to the parties to the dispute.

c. Employees covered by this Agreement may be represented at Board hearings by such person or persons as they may choose and designate, and the Company may be represented by such person or persons as it may choose and designate. Evidence may be presented either orally, or in writing, or both.

d. On request of any individual Board Member, the Board may, by the request of at least any two (2) Board Members summon any witnesses who are employed by the Company, and who may be deemed necessary by the parties to the dispute, or by either party, or by any two (2) Board members.

e. The number of witnesses summoned at any one time shall not be greater than the number which can be spared from the operation without interference with the services of the Company.

f. Unless and until the provisions of Paragraph 6 of this Section become applicable, the Board, composed of two (2) Board Members appointed by the Company and two (2) Board members elected by the employees, or their respective alternates, shall be competent to hear the disputes properly submitted to it and to decide said disputes properly submitted to it and to decide said disputes by majority vote. Decisions of the Board so composed shall be final and binding upon the parties hereto and shall be rendered as soon as is possible but in no event later than ten (10) days after the close of the hearing.

5. The Panel of Referees

a. At as early a date as practicable, the Board shall establish a panel of six (6) potential referees. The six (6) referees agreed upon by the Board shall be designated first, second and third, etc., in order. When it is necessary that a referee sit with the Board as a member thereof pursuant to Paragraph 6 of this Section, the first named referee shall serve unless for any reason he is unable to do so, in which case the second and third and subsequent

named referees shall serve as alternates in that order.

b. At as early a date as practicable after the selection of the panel of referees referred to above, and upon the request of either party, the first named referee shall meet with all the Board for the purpose of reviewing and streamlining the Board's procedures. The basis for such review and modification shall be simplicity, expedition and fairness. The referee shall be empowered to make the final decision in such review and modification. When a referee sits as a member of the Board pursuant to Paragraph 6 of this Section, he shall have the right to modify such procedures for the purpose of that hearing.

c. Any two Board members may, by three (3) months' written notice to the other Board members, without cause, remove any of the named referees. In such event, the referee so removed shall complete matters, if any, pending before him/her pursuant to Paragraph 6 of this Section, and the remaining referee or referees shall serve in the relative order as originally designated. When a referee is removed, pursuant to this Paragraph, the parties shall meet to select a replacement as soon thereafter as is practicable.

6. Procedure in Event of Deadlock

a. Within ten (10) days after the submission of a dispute to the Board pursuant to Paragraph 4–a of this Section and before a hearing has commenced, any two Board members may by written notice to the other Board members, state their desire that the dispute be heard by a five (5) member Board consisting of the two (2) Board Members elected by the employees and two (2) appointed by the Company, or their respective alternates, and a member of the panel of potential referees established pursuant to Paragraph 5 of this Section. In such case, the referee shall be selected in accordance with Paragraph 5 of this Section.

b. Where the hearing in a dispute properly submitted to the Board has commenced before the Board, and where the Board is then composed solely of the two (2) Board Members appointed by the Company and the two (2) Board Members elected by the employees, or their respective alternates, and where the Board is unable by majority vote to decide an issue before it relative to the dispute being heard, the Board shall declare itself deadlocked and it shall select a referee from the panel established pursuant to the subject in the order specified in Paragraph 5 of this Section. In the event the Board has failed to decide such issue or declare itself deadlocked within ten (10) days after the issue has been heard by the Board, then the Board shall be deemed to be deadlocked for the purpose of this Paragraph and shall select a referee as herein provided. The referee so selected shall thereupon join the Board as a member and as the Chairman thereof in the subsequent consideration and disposition of the matter over which the Company and employee Board Members deadlocked and in the subsequent hearing, consideration and disposition of the dispute then being heard.

c. When composed of five (5) members as a result of the procedures set forth in Paragraphs 6–a or 6–b, the Board shall be competent to hear the dispute properly submitted to it and to decide said dispute by majority vote. Decisions of the Board so composed shall be final and binding on the parties and shall be rendered no later than five (5) days after the close of the hearing.

d. Within ten (10) days after the selection of the referee as provided in the preceding Paragraph 6, the five (5) member Board shall consider and review the prior record in the dispute, and it may call such witnesses and receive such evidence as it may deem necessary. Either party may make written request to the Board for the privilege of presenting witnesses or documentary evidence, and the Board

may in its discretion permit such presentation.

e. When composed of five (5) members as a result of the procedure set forth in Paragraph 6a and 6b above, the Board shall be competent to decide said dispute by majority vote. Decisions of the Board so composed shall be final and binding on the parties and shall be rendered no later than five (5) days after the Board has considered and reviewed the prior record in the dispute and/or has received such additional evidence as deemed necessary, whichever is later.

7. In the event the Board is unable to comply with the time limits specified in Paragraphs 4 and 6 above, the Chairperson of the Board shall, prior to the expiration of ten (10) days, notify both parties in writing of the reasons the Board is unable to comply with the time limits, and give a date as early as is possible for when a decision will be rendered. In no event shall the time limits for a return of a decision continue for more than thirty (30) business days.

8. General

a. The expenses and reasonable compensation of the referees selected as provided herein shall be borne equally by the Company and grievant.

b. The time limits specified in this Section may be extended in writing by mutual agreement of the President and the Chief Executive Officer of the Company and the employee grievant.

c. Nothing herein shall be construed to limit, restrict or abridge the rights or privileges accorded either to the employees or to the employer, or to their authorized representatives.

d. The Board shall for a minimum period of five (5) years maintain a complete record of all matters submitted to it for its consideration and of all their findings and decisions.

e. The Company will assume the compensation, travel expense and other related expenses of the Board Members.

f. Each of the parties hereto will assume the compensation, travel expense and other expenses of the witnesses called or summoned by it.

g. The Chairperson and the Vice Chairperson designated pursuant to Paragraph 2–c, acting jointly, shall have the authority to incur such other expenses as in their judgment may be deemed reasonable and necessary for the proper conduct of the business of the Board and such expenses shall be borne one-half by each of the parties hereto. Board Members who are employees of the Company shall be granted necessary time for the performance of their duties as Board Members. Board Members shall be provided reasonable transportation expenses for the purpose of attending meetings of the Board.

h. IT IS UNDERSTOOD AND AGREED THAT EACH AND EVERY BOARD MEMBER SHALL BE FREE TO DISCHARGE HIS/HER DUTY IN AN INDEPENDENT MANNER, WITHOUT FEAR THAT HIS/HER INDIVIDUAL RELATION WITH THE COMPANY OR WITH THE EMPLOYEES MAY BE AFFECTED IN ANY MANNER BY ANY ACTION TAKEN BY HIM/HER IN GOOD FAITH IN THE CAPACITY OF A BOARD MEMBER.

i. The Board shall have the authority for the administration and interpretation of this Section of the Agreement. In the event the Board cannot agree on the administration or interpretation of the Section, they shall refer the matter to the first named referee.

j. In the event a member of the panel of referees is more than ten (10) days overdue beyond any time limits specified in this Section D for the rendering of a decision or any other required act, the member shall not be considered eligible for assignment of additional cases until such decision or act is rendered.

The following are events which upon determination of their occurrence will result in probation, suspension or discharge.

1. Safety related failure to comply with Company or government rules or regulations which could not have endangered persons or property—Probation for one year and a letter of admonition. Second occurrence subject to suspension or discharge.

2. Safety related failure to comply with Company or government rules or regulations which could have endangered persons or property—Suspension—week without pay for first occurrence and second occurrence discharge.

3. Theft of goods or services—Discharge.

4. Indictment for crime—Suspension with out pay during proceedings.

5. Conviction of a crime—Discharge.

6. Written or oral falsification of any information required by the Company—Discharge.

7. Intentionally providing misleading written or oral communications subject to probation for one year and a letter of admonition. Second occurrence subject to discharge or suspension.

8. Conduct in the presence of Company personnel, clients, and industry members which is inconsistent with high standards of personal conduct, i.e. acting under the influence of legal drugs or stimulants, participating in an altercation—Probation for one year and letter of admonition or suspension for first occurrence; second occurrence discharge.

8b. Use of illegal drugs and stimulants—Discharge.

9. Discussing or revealing confidential or proprietary Company or client information. Probation for one year and letter of admonition or suspension; second occurrence discharge.

10. Non–Safety related failure to comply with Company or government rules, procedures and regulation—Probation for one year and letter of admonition; second occurrence subject to suspension or discharge.